UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                                           :
AHMAD ALHARBI, ET AL.,                                     :     **FINDINGS OF FACT AND**
                                                           :     **CONCLUSIONS OF LAW**
                              Plaintiff,                    :
                                                           :        18-CV-2435 (BMC)
              - against -                                   :
                                                           :
STEPHEN MILLER, ET AL.,                                    :
                                                           :
                              Defendant.                    :
---------------------------------------------------------- X

**COGAN**, District Judge.

   This case is before the Court on plaintiffs' motion for a preliminary injunction.  The

parties have submitted motion papers in support of and opposition to the motion, and the Court

has held a hearing on the matter.  The Court's findings and conclusions pursuant to Rule 52(a) of

the Federal Rules of Civil Procedure are set forth below.  To summarize, plaintiffs are likely to

succeed on their petition for a writ of mandamus under the Mandamus Act, 28 U.S.C. § 1361,

and most plaintiffs are entitled to have the Government provide them with their printed, issued

visas.

**FINDINGS OF FACT**

   1. Plaintiffs are members of twenty-one different families, each of which has one or two

United States citizens or lawful permanent residents ("plaintiffs-petitioners") who filed Form I-

130 Petitions for Alien Relatives on behalf of one or more family members who are citizens or

nationals of Yemen ("plaintiffs-beneficiaries").

2. United States Citizenship and Immigration Services ("USCIS") approved the I-130 Petitions and forwarded them to the State Department's National Visa Center to begin pre-processing of potential visa applications by the plaintiffs-beneficiaries.

3. Subsequently, the State Department transferred plaintiffs-beneficiaries' immigrant visa cases from the Embassy in Sana'a, Yemen (where consular services are indefinitely suspended), to the Embassy in Djibouti, one of the consular sections where Yemeni nationals may now apply for visas.

4. The current conflict in Yemen subjected plaintiffs-beneficiaries to severe hardships, as they struggled to survive in a warzone described in detail in declarations they submitted in support of this motion.

5. Accordingly, plaintiffs-beneficiaries fled from Yemen and traveled to Djibouti, where they still reside. There they faced, and continue to face, a new host of hardships as effectively stateless immigrants.   In their declarations, plaintiffs-beneficiaries describe poverty, inadequate medical care, poor education, and isolation.

6. When they arrived in Djibouti, plaintiffs-beneficiaries contacted the Embassy to schedule immigrant visa interviews.

7. Documentary and declaratory evidence supports finding that the following plaintiffs-beneficiaries were issued "approval notices" after their consular interviews, which took place between July and November, 2017: Nidal Assieby, Ahmad Alharbi, Riyadh Alharbi (child of Riyadh Alharbi and Nidal Assieby), Ghadeer Murshed, Taha Thabit, Aisha Thabit, Qasem Thabit, Emad Mugamal, Jehan Alnajjar, Duaa Mugamal, Shahd Mugamal, Musleh Mugamal, Mohamed Mugamal, Hussain Mugamal, Sami Al-Namer, Sadam Mugamal, Yasmeen Mugamal, Salah Mugamal, Nadia Saleh, Nooira Mugamal, Layan Mugamal, Laila Ali, Dheyazan Saeed,

Rashed Al Shugaa, Bassam Almontaser, Aisha Ragih, and Ali Hamood (collectively, "approved plaintiffs-beneficiaries").[1]

8. Each approval notice read, "[y]our visa is approved.  We cannot guarantee how long it will take to print it and have your passport ready for pick up.  You should check the status of your visa online . . . ."  The approval notices then listed a State Department website at which approved plaintiffs-beneficiaries could check their visa status.

9. Interviewing Consular Officers told several of the approved plaintiffs-beneficiaries to continue checking in, to wait for their visas to be printed, or that they would receive their visas shortly.

10. Proclamation 9645 suspends entry into the United States for most Yemeni nationals.  However, section 6(c) of Proclamation 9645 states that "[n]o immigrant or nonimmigrant visa issued before the applicable effective date . . . of this proclamation shall be revoked pursuant to this proclamation."[2]

11. At the time Proclamation 9645 went into effect, Consular Officers had not yet printed approved plaintiffs-beneficiaries' actual visas; none of them had received their visas.

1. After approved plaintiffs-beneficiaries had obtained their approval notices, the Supreme Court issued a stay order on December 4, 2017.  See Trump v. Hawaii, 138 S. Ct. 542 (2017).  That order effected a stay of preliminary injunctions issued by federal district courts in

---

[1] The evidence does not support a finding that Gameelah Alharbi and Iseal Mussa received approval notices.  In her declaration, Gameelah Alharbi states that she "was told to wait in 'admin processing.'"  Iseal Mussa's father has submitted a declaration that does not make it clear that his son received an approval notice.  The evidence shows that Ahmed Al Saidi was issued an expired visa.

[2] A previous iteration of Proclamation 9645, Executive Order 13769, suspended entry or re-entry into the United States by certain aliens from listed countries (including Yemen) regardless of whether they had already been issued a valid immigrant or non-immigrant visa.  Several courts issued injunctions against that order, finding that it was likely to violate due process rights of certain aliens.  See Washington v. Trump, 847 F.3d 1151, 1156 (9th Cir.), reconsideration en banc denied, 853 F.3d 933 (9th Cir. 2017), and reconsideration en banc denied, 858 F.3d 1168 (9th Cir. 2017), and cert. denied sub nom. Golden v. Washington, 138 S. Ct. 448 (2017).

Hawaii and Maryland.  Those preliminary injunctions had stayed implementation of Presidential Proclamation 9645 ("Proclamation 9645").  By reason of the stay order, Proclamation 9645 became operative again.

2. Consular Officers at the Embassy in Djibouti subsequently notified the approved plaintiffs-beneficiaries that pursuant to Proclamation 9645, their immigrant visa applications were refused with no right of appeal.

**CONCLUSIONS OF LAW**

3. A district court may issue a mandatory preliminary injunction, which commands the Government to perform a specific act, only if 1) the movant establishes that it will suffer irreparable harm; and 2) the movant "has shown a 'clear' or 'substantial' likelihood of success on the merits."  Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006). Additionally, the Court must find that the balance of hardships tips decidedly toward the party requesting the preliminary relief.  See Gold v. Feinberg, 101 F.3d 796, 800 (2d Cir. 1996) (internal quotations omitted).  Finally, "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction." Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010).

4. Approved plaintiffs-beneficiaries are likely to suffer irreparable harm if the Government does not provide them with printed, issued visas.  They originally fled Yemen, which they credibly describe as a horrific warzone (a portrayal the Government does not dispute), and must now contend with highly adverse circumstances in Djibouti.  As described in their declarations, vulnerability and uncertainty define their future.

5. Plaintiffs have shown that they are clearly likely to succeed on their petition for a writ of mandamus.  To do so, they must demonstrate 1) a clear right to the relief sought; 2) a plainly

defined and peremptory duty on the part of the defendants to do the act in question; and 3) no other adequate remedy available.  See Anderson v. Bowen, 881 F.2d 1, 5 (2d Cir. 1989).

6. A visa application takes several steps.  See generally Saleh v. Tillerson, 293 F. Supp. 3d 419, 431 (S.D.N.Y. 2018).  First, a U.S. citizen or lawful permanent resident files an I-130 petition with USCIS seeking to have an alien relative classified as an immediate relative.  See 8 U.S.C. § 1154(a)(1)(A); § 1151(b)(2)(A)(i).  After USCIS classifies the alien, the agency refers the alien to the National Visa Center, which handles the processing of the application.  See U.S. Dep't of State, After Your Petition is Approved, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/after-petition-approved.html (last visited May 24, 2018); see also 8 U.S.C. §§ 1201(a)(1), 1202(a).  Upon completing an application, paying a fee, and submitting supporting documents, the applicant is eligible for an interview.  See U.S. Dep't of State, Interview, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/interview.html (last visited May 24, 2018); see also 8 U.S.C. § 1202(b).  As described below, the interview is the final step the applicant must take.  There is no dispute that plaintiffs complied with the preceding steps.

7. Chapter 9, Section 504.9-2 of the Foreign Affairs Manual ("FAM") mandates that the Consular Officers who reviewed the approved plaintiffs-beneficiaries' applications and interviewed them were required to do one of two things after the interview: issue or refuse their visas.[3]  There was no third option.  See id. ("Once an application has been executed, you must either issue the visa or refuse it.  You cannot temporarily refuse, suspend, or hold the visa for future action.  If you refuse the visa, you must inform the applicant of the provisions of law on

---

[3] See Am. Acad. of Religion v. Chertoff, 463 F. Supp. 2d 400, 421 (S.D.N.Y. 2006) (There is no doubt that the Executive has "wide latitude" to grant or deny a visa application, but that discretion "does not include the authority to refuse to adjudicate a visa application.")

which the refusal is based, and of any statutory provision under which administrative relief is available.").  Chapter 9, Section 504.1-3(h) confirms this binary choice: "[t]here are no exceptions to the rule that once a visa application has been properly completed and executed before a consular officer, a visa must be either issued or refused."

8. That same section also makes clear that Consular Officers must issue visas promptly: "any alien to whom a visa is not issued by the end of the working day on which the application is made, or by the end of the next working day if it is normal post procedure to issue visas to some or all applicants the following day, must be found ineligible under one or more provisions of [the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et. seq*.  ("INA")]."  Id.

9. These provisions in the FAM draw on State Department regulations.  See 22 C.F.R. § 41.121 ("When a visa application has been properly completed and executed in accordance with the provisions of the INA and the implementing regulations, the consular officer must either issue or refuse the visa."); 22 C.F.R. § 42.81.

10. The Government explains that the basis for a visa refusal generally falls into one of two broad categories.  First, a reviewing consular officer may determine that an applicant is ineligible on one of the many grounds provided in the INA, such as health-related concerns, conviction for certain crimes, failure to demonstrate proof of adequate financial support in the United States, or fraud in the visa process.  See generally 8 U.S.C. §1182.

11. Second, a reviewing consular officer may determine that he does not have sufficient information to finalize his decision.  When a consular officer makes that determination, he must refuse the application pursuant to INA § 221(g), 8 U.S.C. § 1201(g), which provides

> No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions

of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law . . .

8 U.S.C.A. § 1201(g).  Refusals in this second category can be further divided into two groups: in the first group are those applicants whose application was incomplete, requiring the applicant to take additional affirmative steps before a consular officer can complete his review.  In the second group are applicants with complete applications that require additional administrative processing steps outside of their control.  The Government has submitted an affidavit stating that each of the approved plaintiffs-beneficiaries had their visas refused for "administrative processing."

12. Regardless of the basis for refusal, as described above, all applicants whose visa applications are denied must be given a document at the end of their interview informing them both of their denial and its statutory basis.  See 9 FAM § 504.9-2.  The Government describes this document as intended to help applicants with any next steps they choose to take, but claims that the actual decisions of reviewing consular officers to refuse visas are reflected in entries made in the State Department's electronic Consular Consolidated Database ("CCD"), and that those entries – not the documents provided to applicants – control the outcome of visa applications.

13. The Consular Officers had a non-discretionary duty to either issue or deny each applicant's visa at or promptly after his interview.  The Government does not dispute this.  Nor does the Government dispute that approved plaintiffs-beneficiaries received approval notices, and that none received refusal notices until after the effective date of Proclamation 9645.  The Government acknowledges that this practice was "inconsistent with [State] Department policy."

14. Plaintiffs argue that the approval notices should be interpreted as issued visas.  For the reasons that follow, the Court agrees.

15. First, the Consular Officers provided the approval notices when the applicable regulations and FAM provisions mandated that Consular Officers either issue or refuse their visas.  The timing suggests that the notice be categorized as one or the other.

16. Second, between the two options, the plain text of the approval notices ("your visa has been approved") obviously indicates issuance, not refusal.

17. Third, during or immediately after their interviews, none of the approved plaintiffs-beneficiaries received refusal notices, as the FAM required if they were, in fact, refused.

18. Fourth, the Government represents (and plaintiffs do not dispute), that Consular Officers in Djibouti did not provide an approval notice if an applicant "still had work to do to establish eligibility for a visa and/or [] provide all required supporting documentation."  Instead, in those "situations, the consular section would provide the applicant with a refusal letter . . ."  The Government claims (and plaintiffs dispute), that the Embassy issued approval notices when further work remained to be done on an application, but that work was outside the knowledge or control of an applicant.  In other words, although the Embassy in Djibouti deviated from State Department procedure, it still adjudicated applications.  The Government concedes that the Embassy provided refusal notices to some applicants, but not others (like approved plaintiffs-beneficiaries).  In light of that concession, there is no logical reason to conclude that approval notices should be treated as refusal notices.  The Embassy clearly knew how to issue the latter.

19. Fifth, and perhaps most significantly, the approval notices make no mention of any outstanding "administrative processing" – let alone any substantive processing – that could result in a refusal.  To the contrary, instead of simply being silent as to remaining steps, the

approval notices specifically single out "printing," therefore making clear that a ministerial obstacle – not a substantive one – prevented approved plaintiffs-beneficiaries from having their actual visas in hand.

20. Because the Court interprets the approval notices provided by the Consular Officers as issued visas, they attract the protection of Section 6(c) of Proclamation 9645.  That provision states that issued visas cannot be revoked pursuant to the proclamation.[4]  The approval notices were simply temporary substitutes for the printed visas Section 6(c) intended to shield from revocation.[5]

21. At oral argument, the Government acknowledged that future visa applicants from Yemen (including approved plaintiffs-beneficiaries, if they choose to reapply) will not be issued a visa unless they are "eligible to avail themselves of one of the limited exceptions in the [P]roclamation."  Plaintiffs also claimed that only two applicant waivers (which permit the entry of foreign nationals for whom entry is otherwise suspended) to Proclamation 9645 have been issued in Djibouti.[6]  In light of the implementation of Proclamation 9645, approved plaintiffs-beneficiaries do not have an adequate remedy other than the prompt printing of their visas.

22. Because 1) the Consular Officers were required to act under a plainly defined duty to issue or refuse the visas; 2) in granting the approval notices, the officers issued approved

---

[4] Because the Court concludes that approved plaintiffs-beneficiaries had already been issued visas, their refusal notices are interpreted as revocations.

[5] At oral argument and in their motion papers, plaintiffs argued that the Consular Officers in Djibouti were ill-equipped to handle the influx of visa applicants fleeing war-torn Yemen and could not issue visas as promptly as required by the Foreign Affairs Manual.  In response, Consular Officers implemented a makeshift solution to the problem, and provided "approval notices" to plaintiffs-beneficiaries as stand-ins for properly printed visas. Plaintiffs have submitted no evidence to substantiate this explanation, so the Court does not find it as fact.  The Government states "the consular section at the Embassy in Djibouti [issued approval notices] for the majority of immigrant visa applicants who applied there," from at least June 2015 until January 2018.

[6] Although the Court does not find this as fact, the Government did not dispute the claim.

plaintiffs-beneficiaries' visas; 3) approved plaintiffs-beneficiaries accordingly had a clear right to not have their visas revoked pursuant to Proclamation 9645; and 4) the only adequate remedy is to provide approved plaintiffs-beneficiaries their printed, issued visas, plaintiffs have demonstrated a clear likelihood of success on their petition for a writ of mandamus.

23. The Government raises several arguments, each of which the Court rejects.

24. First, the Government claims that none of the approved plaintiffs-beneficiaries ever had their visa applications approved, and that the approval notices were erroneously given to approved plaintiffs-beneficiaries, inconsistent with State Department policy.  Acknowledging that the rationale behind the Embassy's issuance of the approval notices is "not completely clear," the Government suggests that some Consular Officers intended the notices to encourage applicants to continue checking the listed website for updates on their applications.  The Government notes that the Embassy in Djibouti had no correspondence unit to handle routine communication with visa applicants.

25. This explanation makes no sense.  The Government offers no reasonable explanation for why Consular Officers, in seeking to remind applicants to check their visa status, would have provided approval notices to those whose visas had actually been refused.  Moreover, if the Consular Officers merely intended to prod applicants to check the status of applications in administrative processing, they could have provided a communication with any number of formulations besides, "[y]our visa has been approved" and that the only action remaining was to print it.

26. Second, the Government claims the State Department has no record that any approved plaintiffs-beneficiaries were issued or approved a visa, and that if plaintiffs had checked the website referenced on the approval notices, they would have seen that their visas

had not been approved.  The Government has submitted an affidavit stating that contemporaneously with providing the approval notices, the Consular Officers made entries in the CCD documenting that approved plaintiffs-beneficiaries had, in fact, been refused.

27.  The Government has offered no reasonable explanation of why Consular Officers would deliver approval notices with crystal-clear language to applicants, and then turn to their computers and refuse the same applications.  Even if the Court were to credit this claim, however, it would not help the Government in the face of the issued approval notices.

28. Third, the Government puts forth that the decision memorialized in State Department records, and not the approval notice, controls the status of an application.  But the Government has pointed to no authority in support of this argument, nor to any authority suggesting that the approval notices, or any other documents provided after interviews, should not be afforded weight.

29. Finally, the Government contends that when, in January 2018, the State Department learned that the consular section in Djibouti had been providing approval notices, it ordered an immediate stop to the policy, and directed Consular Officers to provide applicants with refusal notices, where appropriate.  This is irrelevant to deciding how the approval notices, which approved plaintiffs-beneficiaries received before any change in policy, should be treated.

30. The balance of hardships tips overwhelmingly in favor of plaintiffs.  The Government has already reviewed approved plaintiffs-beneficiaries applications, scheduled and conducted interviews, and approved their visas.  The relief mandated by this order only requires the Government to undertake the printing of the visas which the approval notice said would occur. On the other hand, in the absence of injunctive relief, approved plaintiffs-beneficiaries will remain in their untenable position.

31. The public interest is served by the United States adhering to the terms of the Proclamation and honoring its representations to prospective immigrants. Approved plaintiffs-beneficiaries complied with the extensive requirements of the visa-application process, and received approval notices after appropriate review.

32. Notwithstanding this ruling, the ordered relief may be a pyrrhic victory for plaintiffs. The Government has broad authority to revoke visas. <u>See</u> 8 U.S.C. § 1201; 22 C.F.R. § 41.122. However, the Government chose to limit that authority by including section 6(c) in Proclamation 9645, which bars it from doing exactly what it did here. The Government may respond to this decision by revoking approved-plaintiffs beneficiary's visas without reference to Proclamation 9645. That is a decision placed with the Executive, not the Courts, and nothing in this decision should be interpreted to limit its power to do so.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is granted and the preliminary injunction will issue separately.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      May 27, 2018