UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                     :

AHMED ALHARBI, *et al.*,            :
                                       :

                         Plaintiffs,     :     **<u>MEMORANDUM DECISION</u>**
                                       :     **<u>AND ORDER</u>**

           - against -           :
                                       :     18-cv-2435 (BMC)

STEPHEN MILLER, *et al.*,         :
                                       :

                          Defendants.    :
------------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiffs bring this action under the Immigration and Nationality Act ("INA"), 8 U.S.C. 1101 *et seq.*; the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*; <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 (1971); 42 U.S.C. § 1985(3); and the First, Fifth, and Ninth Amendments. Plaintiffs have moved for class certification, and defendants have moved to dismiss the amended complaint. This decision disposes of both motions.

**BACKGROUND**

Plaintiff-petitioners are United States citizens or legal permanent residents who filed a Form I-130 Petition for Alien Relative or asylees who filed a Form I-730 Refugee/Asylee Relative Petition on behalf of an immediate relative who is a Yemeni national.[1] Plaintiff-beneficiaries are the immediate relatives on whose behalf the Form I-130 Petitions or Form I-730

---

[1] Although the amended complaint alleges that these facts are common to all plaintiffs, it appears from the individualized family allegations that some plaintiffs applied for a Form I-797 Notice of Action, a Form I-601A Application for Provisional Unlawful Presence Waiver, or what plaintiffs have described as "visitor visas." That being said, the core of each plaintiff's claim is identical: they were "approved" for entry into the United States, but their "approval" was wrongfully revoked because of the consular officers' improper delay and subsequent reliance on Proclamation 9645.

Petitions were filed.  They fled their homes in Yemen to escape rampant war, famine, and disease, and now reside in Djibouti.

The United States Citizenship and Immigration Services approved each plaintiff-petitioner's Form I-130 Petition or Form I-730 Petition filed on behalf of the plaintiff-beneficiaries.  The Form I-130 Petitions and Form I-730 Petitions were then processed by the National Visa Center and forwarded to the United States Embassy in Djibouti (the "Djibouti Embassy").  Each plaintiff-beneficiary completed an immigrant visa interview with a consular officer at the Djibouti Embassy, after which each plaintiff-beneficiary received a piece of paper that said:

> Your visa is approved.  We cannot guarantee how long it will take to print it and have your passport ready for pick up.  You should check the status of your visa online at:  https://ceac.state.gov/ceeacstattracker/status.aspx.  Please wait at least 24 hours from the point your visa is issued before returning to the Embassy on [day of the week and time].[2]

On September 24, 2017, before any of their visas were printed, the President released Presidential Proclamation 9645, 82 Fed. Reg. 45161, pursuant to Section 212(f) of the INA, 8 U.S.C. § 1182(f).  Section 212(f) provides that:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Proclamation 9645 is titled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or other Public-Safety Threats."  It imposes

---

[2] Here, the amended complaint states that "[u]pon the completion of each Plaintiff-Beneficiary's immigrant visa interview, the Embassy approved each immigrant visa application."  Whether the issuance of this approval notice constitutes a visa approval (and, as discussed further below, an issued visa under Proclamation 9645) is a question of law that the Court must resolve.  It is well-established that a court will reject a plaintiff's legal conclusions stated in the complaint.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Thus, the Court replaces plaintiffs' "approval" characterization with the facts that underly that conclusion.

certain immigration and travel restrictions on individuals from designated countries, including Yemen.

Section 6(c) of the Proclamation, however, is a grandfather clause. It provides that "[n]o immigrant or nonimmigrant visa issued before the applicable effective date under section 7 of this proclamation shall be revoked pursuant to this proclamation."

Section 3(c) of the Proclamation is a waiver provision. It provides in relevant part that consular officers "as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate" and consistent with several additional requirements.

Proclamation 9645 became effective on December 4, 2017, when the Supreme Court issued an order in <u>Trump v. Hawaii</u>, 138 S. Ct. 542 (2017), staying a preliminary injunction issued against the Proclamation and permitting the Government to enforce it.

Once Proclamation 9645 was enforceable, the Djibouti Embassy refused plaintiff-beneficiaries' immigrant visas, stating that they were precluded by its terms. Plaintiffs challenge defendants' delay in printing their visas after their interviews, the subsequent refusal of their visas based on the Proclamation, and defendants' refusal to provide plaintiffs a Proclamation waiver.

## PROCEDURAL HISTORY

Plaintiffs originally filed a complaint on behalf of 61 individuals who are members of 21 Yemeni families. Plaintiffs sought an order mandating that defendants immediately adjudicate their immigrant visa applications. The Court found that documentary and declaratory evidence suggested that 27 plaintiff-beneficiaries were issued approval notices after their consular

interviews, construed those approval notices as issued visas under Section 6(c) of Proclamation 9645, and issued a preliminary injunction ordering the Government to complete any necessary security screenings for those plaintiffs and to issue visas to the individuals who cleared the assessments. Defendants complied with their obligations under the preliminary injunction.

In addition, defendants represent that the Government has *sua sponte* reconsidered or is in the process of reconsidering each plaintiff's visa or waiver refusal under Section 3(c) of Proclamation 9645. Most plaintiffs were issued immigrant visas as a result of this review, although some individuals were denied visas on substantive grounds of inadmissibility unrelated to Proclamation 9645, and some individuals have yet to be reconsidered.

Once defendants complied with the terms of the preliminary injunction, they moved to dismiss the complaint. Plaintiffs filed an amended complaint, adding additional plaintiffs and claims.[3] The amended complaint seeks an order mandating defendants to "correctly adjudicate" their immigrant visa applications, "print and issue" the visas, and provide plaintiffs with an opportunity to submit a waiver to complete adjudication of their immigrant visa applications. The amended complaint also seeks monetary damages.

---

[3] The parties dispute the total number of plaintiffs covered by the amended complaint. Although plaintiffs state that there are 136 named plaintiffs, it appears that plaintiffs' counsel was less than careful in identifying the individuals in the amended complaint. Defendants have pointed to several instances in which a plaintiff appears in the body of the pleading, but not in the case caption, or vice versa. Plaintiffs' explanation that sometimes their names are spelled in different ways is insufficient to remedy this issue. Defendants are entitled to notice of the individuals who are bringing suit against them and the content and bases for each of their claims. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To the extent a plaintiff's name can appear in multiple ways, the case caption should have included other iterations of their name using "a/k/a."

In an attempt to achieve clarity, defendants have provided the Court with appendices attached to their motion to dismiss, and updated appendices attached to their reply in support of their motion to dismiss, which identify the individual plaintiffs and the various procedural categories in which they fall (such as those plaintiffs who have received an immigrant visa subsequent to the filing of the amended complaint). Because these names come from defendants' records, and because plaintiffs' pleadings are neither clear nor up-to-date, the Court will rely on defendants' exhibits for the purpose of identifying individual plaintiffs with respect to these motions.

**DISCUSSION**

I. **Motion for Class Certification**

Plaintiffs seek to certify the following class under Federal Rule of Civil Procedure 23(b)(2):

> All individuals who were: 1) citizens or nationals of Yemen, Syria, Iran, Somalia, [and] Libya, [] 2) who received a visa approval from any US Embassy upon completion of the Plaintiff-Beneficiary's immigrant visa interview between February 25, 2016 to December 8, 2017, and 3) whose visa was not printed and/or not distributed after having been informed by the Embassy that their visa was approved.

Under Rule 23(b)(2), "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Thus, "plaintiffs must meet both the requirements for the [injunctive relief sought], as well as the threshold requirements for class certification under Rule 23(a)," before a class action may be certified. Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 80 (2d Cir. 2015).

Rule 23(a) has four requirements: "numerosity, commonality, typicality, and adequate representation." These "threshold" requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010). As the Supreme Court has made clear, "Rule 23 does not set forth a mere pleading standard." Wal-Mart, 564 U.S. at 349. Rather, plaintiffs "must affirmatively demonstrate [their] compliance with the Rule – that is, [they] must be prepared to prove that

there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Id. (emphasis in original). Indeed, a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982).

The crux of defendants' opposition to class certification rests on the commonality prong, so the Court will take the Rule 23(a) factors out of turn, and address commonality first.

### A. Commonality

To certify a class under Rule 23(a), there must be "questions of law or fact common to the class." See Fed. R. Civ. P. 23(a)(2). Commonality requires plaintiffs to demonstrate that the class members have suffered the same injury, not just that they have suffered a violation of the same law. See Wal-Mart, 564 U.S. at 349-50. "Their claims must depend upon a common contention," which itself "must be of such a nature that it is capable of classwide resolution." Id. In other words, the class action must have the capacity "to generate common answers apt to drive the resolution of the litigation." Id. (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)).

Plaintiffs claim that their common contention – "that they had visa applications that were approved but not printed/distributed before the Proclamation came into effect and that subsequent to the Proclamation being implemented these visas were unlawfully withheld" – is capable of classwide resolution. Because plaintiffs believe that the Government has treated them according to a "seemingly uniform policy," they argue that their allegations can be resolved with equal uniformity.

Plaintiffs acknowledge, however, that there are factual differences among them. Those differences include "matters such as the basis upon which Plaintiff-beneficiaries were eligible for

visas, when and how the visa approval was communicated to the beneficiary, and the details of the eventual assertion of a visa refusal or denial citing the Proclamation by an embassy."

These are not mere background differences between putative class members, as plaintiffs contend. These differences prohibit a common answer that would drive resolution of their claims. This in many respects is because immigration decisions are uniquely fact-based determinations that are dependent not only on the individualized history of each applicant but also on the law in place at the time of their application. Here, the most obvious barrier to commonality is plaintiffs' concession that the visa "approvals" were communicated in different ways and at different times to each plaintiff-beneficiary.

If a plaintiff-beneficiary did not receive one of the contested approval notices before the Proclamation became enforceable, then that individual is differently situated in a material way from the plaintiff-beneficiaries who did receive approval notices during the relevant time. That is because the Court must first determine whether the approval notice even constitutes an "approval," or more precisely, an issued visa under Section 6(c) of the Proclamation, as plaintiffs argue it does, before those plaintiffs can proceed with this lawsuit.

Moreover, the amended complaint does not include any detailed factual allegations describing how any plaintiff or putative class member was approved for (and subsequently denied) a visa other than by receiving an approval notice and a refusal based on Proclamation 9645. Thus, any of the putative class members who did not receive such a notice – but who still claim to have been approved for a visa and subsequently refused that visa – would have suffered a qualitatively different injury than the plaintiffs who are named or referenced in the amended complaint. Plaintiffs have not shown that their injuries *inter se* are capable of the same resolution as the individuals who received an approval notice. Thus, the only individuals who

might have questions common to them are those plaintiff-beneficiaries who received an approval notice from the Djibouti Embassy but subsequently had their visas refused based on Proclamation 9645, and those plaintiff-petitioners who applied for the immigrant visas on their behalf.

But that begs the question of whether the receipt of an approval notice is enough to establish commonality for the purpose of Rule 23(a). It is true that the threshold question of whether the issuance of the approval notice constitutes the issuance of an immigrant visa will resolve a question of law common to those individuals. For example, if the Court determines that an approval notice constitutes an issued visa under Section 6(c) of the Proclamation, then the Court could issue an injunction similar to the preliminary injunction previously issued in this case, directing defendants to conduct any necessary security screenings and print visas for those plaintiff-beneficiaries who pass the assessments and otherwise meet the requirements to obtain a visa.

Defendants argue that because each named plaintiff and each putative class member will be differently situated with respect to these subsequent steps following the issuance of any injunction, including the necessary dispositive security assessments, there is no commonality among them. In other words, because each plaintiff cannot receive a visa – which is the ultimate form of relief sought in the amended complaint – without individualized scrutiny, and because some individuals might receive visas and others might not, there is no common answer appropriate to direct classwide relief.

The Court agrees with defendants – as it did during the preliminary injunction phase – that it cannot simply direct the Government to print visas for each plaintiff and class member, because each individual would require additional necessary security and vetting

procedures before they can receive an immigrant visa and travel packet. For this reason, plaintiffs' ultimate request that the Court mandate that defendants print their visas without any further delay is improper.

But the slightly different question of whether each plaintiff even gets to reach that security screening step is capable of classwide resolution. Indeed, it is the one primary (and dispositive) question that must be determined in the motion to dismiss discussed below. In other words, as plaintiffs even concede, the plaintiffs who received approval notices and were subsequently denied a visa pursuant to Proclamation 9645 have all either suffered an identical injury, or they have all failed to state a claim and cannot obtain any relief.

In this respect, plaintiffs' claims are unlike those raised in <u>Wal-Mart v. Dukes</u>, 564 U.S. 338. There, commonality was not established because to determine whether each putative class member was subject to discriminatory employment practices, which was the common injury alleged in the complaint, would have required individualized consideration of each plaintiff's claims to determine whether they suffered a violation of law. But here, whether the visa refusals based on Proclamation 9645 constitute a violation of law is a question that is identical for everyone who received a visa approval. In other words, plaintiffs' theory can be proved on a classwide basis because the individualized consideration that must be given to each plaintiff with respect to their visa eligibility would follow, not precede, any finding by the Court that a violation of law occurred.

Thus, the commonality prong is met, so long as the common question is viewed as whether the receipt of an approval notice constitutes the issuance of an immigrant visa under Section 6(c) of the Proclamation. Indeed, the common question must be viewed this way, because that is the only alleged injury that each plaintiff suffered.

### B. Numerosity

Under Rule 23(a), the class must also be "so numerous that joinder of all members is impracticable." There are two aspects of the numerosity prong: whether there is a sufficient number of putative class members, and whether joinder, as opposed to class certification, would be impracticable.

Generally, "numerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 Newberg On Class Actions 2d, (1985 Ed.) § 3.05)). But because there "are no strict rules governing the precise number of plaintiffs needed to satisfy the numerosity requirement[,] . . . the focus of the [] inquiry is on the impracticability of joinder." Strykers Bay Neighborhood Council, Inc. v. City of New York, 695 F. Supp. 1531, 1538 (S.D.N.Y. 1988) (internal citations omitted). "Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993) (citing Demarco v. Edens, 390 F.2d 836, 845 (2d Cir. 1968)). "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." Id.

Plaintiffs state that, in addition to the plaintiffs who are named (or referenced) in the amended complaint, their counsel is "aware of approximately 800 other individuals who interviewed at the Djibouti embassy who may fall in the same class." Counsel is aware of these individuals "based on research and experience from [their] office in Djibouti." Plaintiffs also refer to "an unknown number of individuals from other locations who had had their properly approved visas unlawfully withheld."

Although the Government concedes that the putative class would include over 40 members – which suggests that the numerosity prong is established – the Court must address several deficiencies in plaintiffs' numerosity allegations, as the Court is obligated to conduct a rigorous analysis into whether Rule 23(a)'s requirements have been met before it may permissibly certify a class.

First, plaintiffs have not advanced any evidence to suggest that any of the 800 or more putative class members received an approval notice from the Djibouti Embassy. Plaintiffs' allegations that a majority of the named plaintiffs received such a notice does not compel the conclusion that anyone else did too. The fact that plaintiffs' counsel's research suggests that these hypothetical 800 individuals "*may* fall into the class" (emphasis added) is not nearly enough, especially considering that counsel did not put forward the results of that research for the Court or defendants to assess in determining the true scope of the putative class. See In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 33 (2d Cir. 2006), decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig., 483 F.3d 70 (2d Cir. 2007) ("[T]he requirements of Rule 23 must be met, not just supported by some evidence.").

Although plaintiffs have attached to the amended complaint the approval notices that many named plaintiffs received, Rule 23(a) requires them to make an affirmative showing that there are in fact numerous *other* similarly situated individuals before the Court can certify a class of those individuals. Plaintiffs have failed to do that. Instead, it appears that the 800 number advanced by plaintiffs represents the number of individuals who may have interviewed for an immigrant visa at the Djibouti Embassy during the relevant time, not the number of individuals who are similarly situated to the named plaintiffs with respect to the relevant events that occurred after their interviews.

Second, plaintiffs have not advanced any evidence to suggest that any of the 800 or more putative class members received an approval notice from any other embassy besides the Djibouti Embassy. Although plaintiffs attach to the amended complaint what they contend are "approval notices from around the world," there is no apparent connection between those documents and the putative class. As far as the Court can tell, these approval notices were allegedly issued by United States embassies in Mexico, El Salvador, Egypt, and China; but plaintiffs' allegations involve only the Djibouti Embassy. Plaintiffs have provided nothing other than the approval notices received by certain of the named plaintiffs from the Djibouti Embassy and the mere existence of four different approval notices issued by other embassies to suggest that any of the 800 or more members of the putative class received an approval notice from any United States embassy at any point. This is not enough to establish the existence of other class members under the numerosity prong.

Third, plaintiffs have not advanced any evidence to suggest that any of the 800 or more putative class members are from Syria, Iran, Somalia, or Libya. The fact that these countries do not have embassies with consular services – like Yemen – does not establish that individuals from these four countries are similarly situated to the named plaintiffs or the putative class. Nor does the fact that Proclamation 9645 imposes similar travel and immigration restrictions on individuals from these countries as those imposed on Yemeni nationals make individuals from those four countries more likely to have received an approval notice from either the Djibouti or any other embassy.

Plaintiffs' argument that "[i]f the beneficiaries who are nationals of these four nations suffer conduct from Defendants that is more or less egregious than the conduct Plaintiffs named in the FAC suffer, then Defendants should explain how that could be" is an entirely insufficient

basis upon which to grant class certification. Plaintiffs' use of "if" – like the "may" with respect to the breadth of the putative class rejected above – implies a fishing expedition, which class certification is not. Plaintiffs did not request additional class discovery, and they have failed to meet their burden of showing that there are in fact other individuals who have suffered the same purported injury as those plaintiffs named in the amended complaint. A class cannot be certified on the speculation of plaintiffs' counsel. Rather, it must be certified on their proof, which plaintiffs have not supplied.

Plaintiffs' further argument that the Government is in a better position to determine class membership is well-taken, but ultimately unpersuasive. First, plaintiffs' counsel has an office in Djibouti, through which they were already able to successfully identify over 100 individuals to name in this lawsuit (and purportedly research and ascertain the existence of 800 other individuals). Second, defendants represent that the only way the Government can identify an individual who received one of the contested approval notices is if they came forward and produced a copy of the notice. Although plaintiffs scoff at this assertion, finding it incredulous that the Government would not keep adequate records of this information, the Court will not assume the Government is misrepresenting its ability to determine who received an approval notice. This is especially true given that defendants have maintained throughout the pendency of this litigation that the approval notices were issued in error and their records indicate uniformly that each of the plaintiffs were originally denied an immigrant visa. Based on the information submitted with the motion for class certification, it does not appear that the Government can do anything more than plaintiffs' counsel to identify potential class members.

Thus, the putative class at best consists of a group of 136 individuals, who plaintiffs have specifically alleged or shown with documentary evidence to have received an approval notice.

Although this number is greater than 40, plaintiffs cannot show that "members of the alleged class are so numerous as to make it impracticable to bring them all before the court." Demarco, 390 F.2d at 845. Each of these individuals has already joined this action and is either named or directly referenced in the amended complaint, so it can hardly be said that joinder is impracticable. See Daigle v. Shell Oil Co., 133 F.R.D. 600, 603 (D. Colo. 1990) (finding numerosity prong was not met because joinder was not impracticable where only 78 individuals expressed interest in joining the lawsuit and all 78 were already named as plaintiffs). Nor for that matter would considerations of plaintiffs' geography or financial resources, or considerations of judicial economy bear on the outcome, because by joining this action, each plaintiff has confirmed that those factors did not dissuade them from individually pursuing their claims.

"What evidence there is in the record as to the size of the 'class' and the impracticability of joinder is pure speculation," Demarco, 390 F.2d at 845, and a class cannot be certified on speculation. Thus, the numerosity prong is not met.

### C. Ascertainability

In addition to its express requirements, the Second Circuit has "recognized an implied requirement of ascertainability in Rule 23 of the Federal Rules of Civil Procedure." Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation marks and citations omitted). The "touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Id. (internal quotation marks and citations omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." Id. at 24-25 (quoting Charron v.

<u>Pinnacle Grp. N.Y. LLC</u>, 269 F.R.D. 221, 229 (S.D.N.Y. 2010)). In other words, "the members of a proposed class [must be] readily identifiable." <u>In re Petrobras Sec.</u>, 862 F.3d 250, 264 (2d Cir. 2017).

Besides their failure to meet the four threshold statutory requirements of Rule 23(a), plaintiffs have also failed to show the implied requirement that their putative class is ascertainable. This analysis overlaps somewhat with both the commonality and numerosity prongs, because based on defendants' representations, there is no way to identify, unless they come forward, individuals who have received an approval notice or the immigration status of those individuals.

First, and most glaring, is that the approval notices are not official records of the Government. They are not dated, nor do they have any identifying or authenticating information on them. Once any individual comes forward with their approval notice, it would still require a mini-hearing on the merits of their claim before the parties and the Court could determine whether that individual is a putative class member. Defendants would have to review their records to determine whether that individual actually interviewed with the Djibouti Embassy, and when; whether they were refused pursuant to Proclamation 9645, on substantive grounds of inadmissibility, or not at all; and further, whether that individual received their approval notice before or after the Proclamation became effective; among other inquiries. The merits of each of their immigration statuses would also need to be vetted before they could be recognized as a member of the class.

Second, as defendants point out, the immigration status of any potential class member could change over the course of the litigation. For example, those plaintiffs undergoing defendants' *sua sponte* reconsideration of their visa waiver or refusals might be issued (or

substantively refused) an immigrant visa before they would otherwise receive their requested relief in this case. Indeed, that has already happened, because some putative class members were issued visas and travel packets after having been previously refused under the Proclamation and other putative class members were denied visas based on substantive grounds of inadmissibility after having previously been refused under the Proclamation.

This shows that, at any point during the litigation, the Court and the parties might not know who in fact is in the class. This risk is untenable, because the class action would be impossible to manage. See Brecher, 806 F.3d at 25 n.3 (finding class certification inappropriate for lack of ascertainability where "the identity of class members will remain fluid even following entry of judgment, since nothing in the new class definition freezes the class composition at any designated time").

Although the Second Circuit has explicitly rejected the adoption of a "freestanding administrative feasibility requirement" in this analysis, ascertainability still requires that "a class be defined using objective criteria that establish a membership with definite boundaries." In re Petrobras, 862 F.3d at 264. It is not simply that a class action would be unfeasible in this case; it is that at any given moment, the parties and the Court would have to assess the merits of every individual's claim to know whether their allegation of class membership is or remains viable. This renders the putative class insufficiently definite.

Because plaintiffs have met neither the express nor implied requirements of certifying a class under Rule 23, their motion for class certification is denied.

## II.     Motion to Dismiss

Defendants argue that most of the named plaintiffs' claims should be dismissed as moot, because they have already been issued immigrant visas.

Defendants have also moved to dismiss certain of plaintiffs' claims under Rules 12(b)(1) and 12(h)(3), for lack of subject matter jurisdiction, and others under Rule 12(b)(6), for failure to state a claim. The Court will address each basis to dismiss in turn.

### A. Mootness

"Article III of the Constitution limits federal-court jurisdiction to 'cases' and 'controversies.'" Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 669 (2016) (citing U.S. Const., Art. III, § 2). An "actual controversy [must] be extant at all stages of review, not merely at the time the complaint is filed." Id. (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997)).

"There is [] no case or controversy, and a suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Chafin v. Chafin, 568 U.S. 165, 172 (2013) (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)). In other words, a case becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" Campbell-Ewald Co., 136 S. Ct. at 669 (quoting Knox v. Service Employees, 567 U.S. 298, 307 (2012)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" Already, LLC, 568 U.S at 91 (quoting Alvarez v. Smith, 558 U.S. 87, 93 (2009)).

Defendants claim that those plaintiffs who have been issued immigrant visas (whether pursuant to the original preliminary injunction issued in this case or the Government's subsequent *sua sponte* reconsideration of each plaintiff's visa refusal or waiver eligibility) no longer present a live case or controversy and thus, their claims must be dismissed as moot.

The Court agrees that the alleged wrongful conduct as to those plaintiffs – delaying or failing to issue their visas – has been remedied. At this point, they have been issued their immigrant visas, which is the relief they sought in the amended complaint. There is nothing more that the Court can order defendants to do with respect to those plaintiffs. Plaintiffs seem to concede this point, albeit by silence rather than explicitly.

This is not a situation where defendants have temporarily halted their allegedly unlawful conduct while maintaining the possibility of engaging in that conduct again (which, of course, cannot render a case moot). See Already, LLC, 568 U.S. at 91. Plaintiffs have already gone through the application and interview process. Having received a visa at the end of that process, they cannot fairly expect this conduct to happen to them again. The injuries that they alleged to have suffered have been remedied in full.

Nor does this case fall "within the exception to the mootness doctrine for those situations capable of repetition, yet evading review." Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993) (citing Southern Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515 (1911)). Where, as here, a class action has not been certified, "that exception is unavailable unless "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." Id. (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)). As explained above, no plaintiff who has received an immigrant visa can reasonably expect to be subjected to the same purportedly illegal conduct again. Because both prongs of this test have not been met, this exception to the mootness doctrine does not apply.

Plaintiffs also argue, however, that these individuals' claims are not moot because they still maintain an interest in having their rights declared. But the Court cannot declare

retroactively that the delay or refusal that any single plaintiff experienced before their visa was issued constituted a violation of that plaintiff's rights.

The Second Circuit's long-standing precedent with respect to college graduates' claims against the universities they attended is informative here. In those cases, the Second Circuit has consistently held that "students' declaratory and injunctive claims against the universities that they attend are mooted by the graduation of the students," because following their graduation, the court cannot do anything to redress the injury that they allegedly suffered while they were a student. Fox v. Bd. of Trustees of State Univ. of New York, 42 F.3d 135, 140 (2d Cir. 1994). Applying that principle here, plaintiffs who have already been issued their immigrant visas similarly do not have a "distinct and palpable injury . . . that the exercise of the Court's remedial powers would redress." Alexander v. Yale Univ., 631 F.2d 178, 183 (2d Cir. 1980) (internal quotation marks and citations omitted).

Moreover, plaintiffs have not explained why they have any real interest in such a declaration, or how such a declaration would provide any legally cognizable benefit to them. Indeed, they have received precisely what they asked for, and the Court cannot afford them anything further with respect to the injunctive and declaratory relief sought in the amended complaint. As a result, these plaintiffs no longer have a "concrete interest" in the outcome of that aspect of the litigation. See Campbell-Ewald Co., 136 S. Ct. at 669 (citing Chafin, 568 U.S. at 172).

Their claims for monetary damages, however, are different. Generally, a viable damages claim will trigger the Court's remedial powers even if the Court cannot provide injunctive or declaratory relief. See Cook, 992 F.2d at 19. The amended complaint makes repeated mention of financial hardship across plaintiffs, and it raises claims for damages under Bivens, 403 U.S.

388, as well as other general demands for "damages."  Although the "Prayer for Relief" does not include any mention of damages, the amended complaint can be fairly construed to raise those claims.

Thus, the following plaintiffs' claims for injunctive and declaratory relief are dismissed as moot:  Nugood Motaher Mussed Ahmed, Ruqaia Taher Aldafri, Altazam Mohamed Nagi Algaad, Lutfiah Ali Abdo Algamal, Ahmed Riyadh Ahmed Alharbi, Fadel Saleh Alharbi, Gameelah Naji Mohammed Alharbi, Riyadh Ahmed Nagi Alharbi, Hussein Saeed Ali, Laila Hussein Saeed Ali, Tahani Musa Ahmed Ali, Wedad Essmail Ali, Bassam Ahmed Murshed Al Montaser, Fadil Ali Al Mulaiki, Zahr Almulaiki, Samia Mohamed Saleh Al Namer, Abduh Ahmed Alqassari, Ahmed Mohammed Hamood AL Saidi, Rashed Ameen Ashugaa Addin Ali Al Shugga, Hizam Fadil Alzookari, Ahmed Gamil Ahmed Assaedy, Gamil Ahmed Assaedy, Nidal Abdoalwahab Moh Ashieeby, Mohammed Saleh Husain, Yaseen Mohamed Saleh Husain, Abdulla Mohamed Mugamal, Hussain Abdulla Mohamed Mugamal, Layan Salah Abdulla Mugamal, Nooria Salh Abdulla Mugamal, Sadam Hussain Abdulla Mugamal, Salah Abdulla Mohamed Mugamal, Yaseem Hussain Abdulla Mugamal, Saleh Hizam Murshed, Yahya Hizam Murshed, Ali Ahmed Mussa, Iseal Ali Ahmed Mussa, Hanan Mohamed Nagi, Arwa Mohamed Qahtan, Redan Mohamed Nasser Qahtan, Abdulbaset Abdulsamad Rageh, Ghadeer Yahya Hizam Murshed Rageh, Aisha Mohamed Abdulatif Ragih, Dheyazan Qasem Thabit Saeed, Saif Dheyazan Saeed, Kaid Mohamed Saleh, Nadia Abdo Niga Saleh, Kamal Nasser Salim, Nasser Kamal Nasser Salim, Aisha Hussein Abdulrahman Thabit, Qasem Hussein Abdulraham Thabit, Taha Hussein Abdulrahman Thabit, Ehtiram Ali Abdo Yahya, Sumaia Abdulla Saleh Abdulrahman, Ahmed Omar Mohammed Al Amodi, Sultan Abdulsalam Ahmed Al Awdi, Ghadeer Abdullah Al-Howthi, Ali Hamood Mohamed Ali, Abdulaziz Redwan Essmail

Mohamed Ali, Aisha Redwan Essmail Mohamed Ali, Fatima Redwan Essmail Mohamed Ali, Faryan Redwan Essmail Mohamed Ali, Montaser Redwan Essmail Mohamed Ali, Nesmah Abdo Mohammed Ali, Redwan Essmail Mohamed Ali, Riyadh Redwan Essmail Mohamed Ali, Kafa Murshed Ahmed Dhaif Allah Al-Muntaser, Abdulraqeb Saleh Ahmed Hadi, Awad Abdulraqeb Saleh Ahmed Hadi, Basma Abdulraqeb Saleh Ahmed Hadi, Gana Abdulraqeb Saleh Ahmed Hadi, Kawthar Abdulraqeb Saleh Ahmed Hadi, Mohammed Mosed Kassim Hadi, Abeer Kahtan Mohammed Jaber, Entibah Ali Hazam Marched, Ali Ahmed Murshed, Hassan Hazam Shukri Murshed, Sabah Shukri Hasan Hazam Murshed, Tamnia Shukri Hassan Hazam Murshed, Mariam Muthana, Noor Muthana, Mohamed Jamil Qasem Al Hadai, Rukayah Mokbel Ali Ghalieb, Ali Shukri Hasan Murshed.[4]

The only individuals with a live, justiciable case or controversy with respect to the claims for injunctive and declaratory relief in the amended complaint are those plaintiffs who have yet to receive an immigrant visa despite having received an approval notice, and those plaintiffs who were refused an immigrant visa, either for substantive inadmissibility reasons or based on Proclamation 9645.[5]

---

[4] This list includes the individuals named on Updated Appendix C attached to defendants' reply memorandum in support of their motion to dismiss. As explained above, because this list is based on defendants' official records and because plaintiffs' pleadings are less than clear as to who the individual plaintiffs are, the Court adopts updated Exhibit C as representative of the plaintiffs who have been issued an immigrant visa. To the extent any other plaintiffs have received an immigrant visa since defendants filed their reply in support of the motion to dismiss, this outcome applies to those plaintiffs as well.

[5] Although the Court could have addressed this merits issue in disposing of plaintiffs' motion for class certification, see Wal-Mart, 564 U.S. at 351, this presents a separate reason why class certification must be denied. Most of the individuals who plaintiffs sought to have serve as class representatives (which was each named plaintiff) would not have met the typicality or adequacy factors articulated in Rules 23(a)(3)-(4). These plaintiffs are clearly subject to unique claims and defenses, namely mootness, and, as a result, they would not have had an incentive to vigorously adjudicate the rights of those plaintiffs who have not received or were refused a visa, because they have already received the maximum amount of the primary form of relief sought in the amended complaint.

### B. *Lack of Subject Matter Jurisdiction*

Defendants have moved to dismiss Counts One, Two, Five, and Nine for lack of subject matter jurisdiction. These counts generally challenge defendants' decision to refuse plaintiffs' immigrant visas after having issued them an approval notice.

Under Rules 12(b)(1) and (h)(3), a district court must dismiss an action if it "determines at any time that it lacks subject-matter jurisdiction." "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Id. (internal citations omitted). And "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." Id. (internal citations omitted).

### 1. Count 1: Mandamus Act, 28 U.S.C. § 1361

The INA prohibits aliens from entering or permanently residing in the United States without a visa. See Kerry v. Din, 135 S. Ct. 2128, 2131 (2015) (citing 8 U.S.C. § 1181(a)). There is a special application process, however, for aliens whose immediate relatives permanently reside in the United States. As is generally described above, a United States citizen or lawful permanent resident may file a petition on behalf of an alien who is their immediate relative, and if that petition is approved, "the alien may apply for a visa by submitting the required documents and appearing at a United States Embassy or consulate for an interview with a consular officer." Id. (internal citations omitted).

The United States Department of State Foreign Affairs Manual and Handbook (the "FAM") – which governs the duties and responsibilities of consular officers in issuing and refusing immigrant visas – provides that "[o]nce an application has been executed, [the consular officer] must either issue the visa or refuse it." 9 FAM § 504.9-2. But "[b]efore issuing a visa, the consular officer must ensure the alien is not inadmissible under any provision of the INA." Din, 135 S. Ct. at 2131 (citing 8 U.S.C. § 1361).

Plaintiffs generally allege that defendants issued visa approval notices to them, thereby approving their visas, and then purposefully delayed in printing the visas and wrongfully relied on Proclamation 9645 to refuse them. Plaintiffs cite to the grandfather clause, Section 6(c) of Proclamation 9645, in support of their argument that defendants' refusals based on the Proclamation were wrongful. According to plaintiffs' theory of the case, because their visas were "issued" before the Proclamation took effect, those visas cannot be denied because of the Proclamation.[6] As a result, plaintiffs seek an order under the Mandamus Act, 28 U.S.C. § 1361, to compel defendants to complete the processing of their immigrant visas and "issue a facially legitimate and bona fide determination in good faith."

Under 28 U.S.C. § 1361, a district court has original jurisdiction "of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." "To establish jurisdiction under 28 U.S.C. § 1361, [plaintiffs] must show (1) a clear right to the relief sought; (2) a plainly defined and peremptory duty on the part of defendants to do the act in question; and (3) that there is no other adequate

---

[6] Plaintiffs did not explicitly allege that an approval notice constitutes an issued visa under Section 6(c) of the Proclamation. But under a literal reading of the grandfather clause, only visas which were *issued* before the effective date cannot be revoked under the Proclamation. It says nothing about revoking "approved" visas. Consistent with its obligation to construe the facts in the amended complaint in the light most favorable to plaintiffs, however, the Court construes plaintiffs' allegations of "approval" as allegations of issued visas.

remedy available." <u>Khanom v. Kerry</u>, 37 F. Supp. 3d 567, 577 (E.D.N.Y. 2014) (internal quotation marks, citations, and alterations omitted).

Defendants argue that the Court does not have jurisdiction to hear these claims under the doctrine of consular nonreviewability.[7] "[T]he doctrine of consular nonreviewability precludes judicial review of a consular official's decision to issue or withhold a visa." <u>Abdo v. Tillerson</u>, No. 17 CIV. 7519, 2019 WL 464819, at *3 (S.D.N.Y. Feb. 5, 2019) (internal citations omitted); <u>see also Khanom</u>, 37 F. Supp. 3d at 577 (finding that alien plaintiffs did not have a clear right to an order compelling the issuance of a visa and defendants did not have a plainly defined and peremptory duty to grant plaintiffs the visa "because the decision to issue or deny a visa is firmly rooted in the discretion of the Consul General").

Rather, when an alien challenges a consular decision to deny them an immigrant visa, the Court's review is limited to whether defendants have advanced a "facially legitimate and bona fide reason" for that refusal. <u>Kleindienst v. Mandel</u>, 408 U.S. 753, 770 (1972). If such a reason is provided, the Court cannot "look behind the exercise of that discretion, nor test it by balancing its justification against" the constitutional interests asserted by the alien who was refused. <u>Id.</u>

Plaintiffs argue that the Court is not bound by the consular nonreviewability doctrine pursuant to Justice Kennedy's concurring opinion in <u>Kerry v. Din</u>, 135 S. Ct. 2128, because the consular officers' decisions to delay printing or to refuse their visas were made in bad faith. As Justice Kennedy explained, the Court can "look behind" the asserted justification for the refusal

---

[7] The Second Circuit has intimated that the doctrine of consular nonreviewability does not mean that the Court lacks subject matter jurisdiction in the traditional sense. Rather, it has explained that "the generally available federal question jurisdiction provided by section 1331 to adjudicate [federal] claims is withdrawn where the claim is based on a consular officer's denial of a visa, or that prudential considerations, perhaps arising from separation of powers concerns, counsel against exercising normally available jurisdiction." <u>Am. Acad. of Religion v. Napolitano</u>, 573 F.3d 115, 123 (2d Cir. 2009). Regardless of how the issue is framed, the Court generally cannot review a consular officer's decision to issue or deny a visa to any particular alien.

if there is an "affirmative showing of bad faith on the part of the consular officer who denied" the alien the visa. Id. at 2141 (Kennedy, J., concurring in the judgment).

The amended complaint alleges that the consular officers "acted in bad faith by permitting other federal agencies to make the final determination on" their immigrant visas. But mere statements that the "consular officer has acted in bad faith by following instructions from an outside agency that has neither the authority nor the jurisdiction to issue instructions regarding the approval of visas" are not enough to permit judicial review of those consular officers' decisions.

Plaintiffs have not included any facts to support their claim of bad faith. At best, their amended complaint can be read to allege that, instead of printing plaintiffs' visas once they were "approved," and thus "issuing" them to plaintiffs, defendants listened to unspecified instructions given by an unidentified outside agency to delay printing the visas for an unspecified amount of time so that they could later refuse the visas based on Proclamation 9645.

This is textbook conclusory pleading.[8] Plaintiffs' speculation does not amount to facts, and a complaint must include enough facts to "nudge[] [plaintiffs'] claims . . . across the line from conceivable to plausible." Iqbal, 556 U.S. at 680 (internal quotation marks omitted). As the Supreme Court explained in Ashcroft v. Iqbal, 556 U.S. at 681:

> To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in Twombly rejected the plaintiffs' express allegation of a contract, combination or conspiracy to prevent competitive entry, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

---

[8] Although defendants have made this motion pursuant to Rule 12(b)(1), and not Rule 12(b)(6), discussed infra, plaintiffs must meet the threshold pleading requirements under Rule 12(b)(6) with respect to their affirmative allegation of bad faith to avoid dismissal for lack of subject matter jurisdiction under the doctrine of consular nonreviewability.

The same is true here. Justice Kennedy was clear in his concurrence that an alien must first make an "affirmative showing" of bad faith before the Court can examine the propriety of a consular officer's decision to deny them a visa or look for additional factual details beyond that which was provided to the alien. <u>Din</u>, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment). Bad faith must be "plausibly alleged with sufficient particularity," <u>id.</u>, and the allegations must be "well supported," <u>see</u> <u>Gogilashvili v. Holder</u>, No. 11-CV-01502, 2012 WL 2394820, at *7 (E.D.N.Y. June 25, 2012) (citing <u>Napolitano</u>, 573 F.3d at 137).

Here, plaintiffs' allegations of bad faith are neither plausible nor particular, and they are certainly not well supported by any factual allegations. As a result, the Court's review of plaintiffs' visa denials is constrained to whether defendants have advanced a facially legitimate and bona fide reason for those refusals.

Different categories of plaintiffs received different reasons for their refusals, so the Court must address each group of plaintiffs individually.

The individuals listed on Appendix D attached to defendants' reply memorandum in support of their motion to dismiss were denied immigrant visas based on substantive inadmissibility reasons, not Proclamation 9645. Those substantive grounds of inadmissibility constitute a facially legitimate and bona fide reason for refusing their visas. Even Justice Kennedy in his concurrence in <u>Kerry v. Din</u> recognized that the Government is not required to provide anything more than the statutory provision under which the consular officer denied the alien's visa. That remains the case even if that provision covers a broad range of conduct and the general statutory citation does not indicate the specific subsection or conduct that precipitated the refusal. <u>See</u> <u>Din</u>, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment). Having received

a facially legitimate and bona fide reason for their refusal, the Court cannot look beyond that reason under the doctrine of consular nonreviewability.

Moreover, even if defendants' issuance of the approval notices constituted an approval or an issued visa, which was later refused on substantive inadmissibility grounds, the INA provides that a consular officer's decision to revoke a previously-issued visa is not subject to judicial review. See 8 U.S.C. § 1201(i). Thus, the Court simply cannot review these refusals.

As a result, the following individuals' claims are dismissed for lack of subject matter jurisdiction: Alya Mohammed Ali Ahmed, Jehan Fateh Musleh Al Najjar, Duaa Emad Abdulla Mugamal, Emad Abdulla Mohamed Mugamal, Mohamed Emad Abdulla Mugamal, Musleh Emad Abdulla Mugamal, Shahd Emad Abdulla Mugamal, Sultan Saleh Ali Obaid, Mona Saleh Ali Obaid, Yassin Mohamed Taher, and Mohamed Ahmed Taher.[9]

The plaintiffs reflected on Appendices E, F, and G, however, have not received immigrant visas nor were they rejected on substantive grounds of inadmissibility. These plaintiffs received an approval notice, but their visas were subsequently refused under Proclamation 9645, and their status has not changed since. Although these plaintiffs are currently undergoing the Government's *sua sponte* case-by-case waiver analysis, the Court must determine whether their refusals based on Proclamation 9645 were facially legitimate and bona fide.

Under these circumstances, a refusal based on Proclamation 9645 could only be facially legitimate and bona fide if these plaintiffs were not issued visas before the effective date of the Proclamation. Otherwise, their visas could not be revoked under the Proclamation, pursuant to

---

[9] These are the individuals listed on Appendix D, attached to defendants' reply in support of their motion to dismiss, which the Court adopts for the reasons discussed in note 4, supra. This outcome also applies to any individual plaintiff whose visa has been refused on substantive grounds of inadmissibility since the filing of defendants' reply memorandum in support of their motion to dismiss.

its grandfather clause. This turns on whether the issuance of the approval notices qualifies as an issuance of plaintiffs' visas under Section 6(c) of the Proclamation.

Defendants maintain that the approval notices that plaintiffs received do not mean that their immigrant visas were issued for purpose of Proclamation 9645's grandfather clause. Plaintiffs, of course, assert that they do. The Court previously found that plaintiffs were likely to succeed on the merits and issued a preliminary injunction ordering defendants to conduct the necessary security screenings and print immigrant visas for plaintiffs who successfully cleared those security assessments.

Although they do not say it explicitly, plaintiffs seem to rely on the Court's decision in issuing the preliminary injunction as law of the case, and demand that the Court issue a similar order for the additional plaintiffs named in the amended complaint. But plaintiffs have provided no reason why the Court should adhere to its preliminary decision, other than the bald assertions made in the amended complaint that defendants acted purposefully, with discriminatory animus, and in bad faith.

A district court's decision to grant a temporary or preliminary injunction "does not constitute the law of the case and will not estop the parties nor the court as to the merits of the case." Sec. & Exch. Comm'n v. N. Am. Research & Dev. Corp., 59 F.R.D. 111, 113 (S.D.N.Y. 1972) (quoting Benson Hotel Corp. v. Woods, 168 F.2d 694, 697 (8th Cir. 1948)). "This rule stems from the due process requirement that the parties should not be foreclosed on the merits by a hearing that expressly addressed only preliminary questions, and at which [the] parties may not have presented their best possible case." Id. Rather, as the Second Circuit has explained:

> A preliminary determination of likelihood of success on the merits in a ruling on a motion for preliminary injunction is ordinarily tentative, pending a trial or motion for summary judgment. . . . It would therefore be anomalous at least in most cases, and here, to regard the initial ruling as foreclosing the subsequent, more

thorough consideration of the merits that the preliminary injunction expressly envisions.

Goodheart Clothing Co. v. Laura Goodman Enterprises, Inc., 962 F.2d 268, 274 (2d Cir. 1992).

Thus, the Court is not wedded to its previous determination that the approval notices constitute issued visas under Section 6(c) of the Proclamation. With the benefit of complete briefing of the merits of plaintiffs' claims, the Court must now determine whether plaintiffs were "issued" immigrant visas for the purpose of Section 6(c) of Proclamation 9645.

According to the amended complaint and the documents attached to it, following their immigrant interviews with a consular officer, plaintiffs were given a single sheet of paper informing them that their visas were approved but that they were not ready to be printed or picked up. This piece of paper did not bear an official insignia or stamp, it was not signed or dated, and it did not identify the alien or interviewing consular officer by name or provide any other identifying or biographical information (other than the alien's case number).

In other words, plaintiffs were given a sheet of paper that did not have on it any semblance of officiality or authority. But "to issue" means "[t]o accrue," "[t]o be put forth officially," or "[t]o send out or distribute officially." Issue, Black's Law Dictionary (10th ed. 2014). Although the notices indicated that their visas were approved, there was nothing "official" about them. As defendants point out, plaintiffs could not travel or enter the country with one of these approval notices. It is not a proxy for a visa, and it is apparent from each plaintiff's experience that it cannot be traded in for a visa at the Djibouti Embassy.

The fact that the approval notice did not purport to be, or even resemble, an official document alone suggests that plaintiffs were not "issued" visas before Proclamation 9645's effective date for the purpose of the grandfather clause. This conclusion is further supported by the regulatory and statutory scheme pursuant to which a consular officer may issue or refuse an

immigrant visa. At the preliminary injunction stage, the Court focused on the binary nature of a consular officer's decision to issue or refuse a visa following plaintiffs' immigrant interviews. Indeed, the instructions governing the consular officers' conduct are exacting on this point. As noted above, the FAM provides that "[o]nce an application has been executed, [the consular officer] must either issue the visa or refuse it. [The consular officer] cannot temporarily refuse, suspend, or hold the visa for future action." There are no exceptions to this rule. See 9 FAM § 504.11-2(A)(a).

Thus, if the consular officer decides to approve an immigrant visa, the officer must immediately issue it. Conversely, if a consular officer refuses an immigrant visa, the alien must be provided with a document that sets forth the reason or reasons for their refusal. See 9 FAM § 504.9-2. As the Court said in its order issuing the preliminary injunction, there is no third option. The visa must be issued or refused. Because these duties are non-discretionary; because plaintiffs were not told their visa was refused or provided with a document that set forth the reason for that refusal; and because plaintiffs were provided with a document that said their visas were approved, the Court – for the purpose of a preliminary injunction only – construed the approval notices as issued visas.

Upon complete merits briefing and additional consideration of the FAM, the Court gives greater weight to Chapter 9 Section 504.11-2(A)(a) of the FAM, which provides that:

> [A]ny alien to whom a visa is not issued by the end of the working day on which the application is made, or by the end of the next working day if it is normal post procedure to issue visas to some or all applicants the following day, must be found ineligible under one or more provisions of INA 212(a), 212(e), or 221(g). (INA 221(g) is not to be used when a provision of INA 212(a) is applicable.) This requirement to find an applicant ineligible when a visa is not issued applies even when: (1) (U) A case is medically deferred; (2) (U) The post requests an advisory opinion from the Department; (3) (U) The post decides to make additional local inquiries or conduct a full investigation; or (4) (U) The only deficiency is a clearance from another post.

When this section of the FAM is read in conjunction with Section 212(a) of the INA, 8 U.S.C. § 1182(a), which is cited in the FAM as a means through which an alien who was not issued a visa on the day of or day following their interview is ineligible for entry, it becomes clear that plaintiffs were not issued visas vis-à-vis the approval notices that they received. Specifically, Section 212(a)(I) of the INA provides that:

> [A]ny immigrant at the time of application for admission – (I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or (II) whose visa has been issued without compliance with the provisions of section 1153 of this title, is inadmissible.

8 U.S.C. § 1182(a)(7)(A).

If plaintiffs were in fact approved for immigrant visas, the consular officer would have been required under the FAM to issue their visas on the day of their interviews, or the following day. Because they were not issued visas, the INA mandates that plaintiffs are necessarily inadmissible. There are no exceptions to these rules.

The binary responsibilities of the consular officers – that is, to issue or refuse a visa – remain important. But rather than focusing on the lack of clear refusal, as the Court did during the preliminary injunction phase to construe the approval notices as issued visas, the lack of clear approval – as evidenced by the consular officers' failure to issue each plaintiff a visa on the day of or day following their interview – compels the Court to conclude that plaintiffs were not issued visas when they received these approval notices. Plaintiffs were never given an official document with which they can be deemed admissible under the INA and permissibly enter the United States.

Even though there is a clear distinction between visa issuance and admissibility determinations under the INA, that fact does not change the outcome here. It is true that "even if a consular officer issues a visa, entry into the United States is not guaranteed." Trump v. Hawaii, 138 S. Ct. 2392, 2414 (2018). Upon the alien's arrival in the United States, an immigration official can still determine that the alien is inadmissible under the INA, notwithstanding the fact that they have been issued an immigrant visa pursuant to the process described above. See id. Thus, the fact that plaintiffs could not have used the approval notices to gain admission into the country has some merit with respect to plaintiffs' argument that they still could have been issued a visa before they were refused pursuant to the Proclamation. But this argument is ultimately unpersuasive, because the approval notice could never have been used in lieu of a visa.

These notices cannot be construed as conveying official or authoritative approval. They simply do not have any legal meaning. The approval notice would at best constitute a "pending case," because the visa had not yet been issued. But as the FAM makes clear, "[t]here is no such thing as an informal refusal or a pending case once a formal application has been made." 9 FAM § 504.11-2(A)(b).

Although it appears that the consular officers in the Djibouti Embassy might not have adhered to their non-discretionary binary responsibilities, that does not mean plaintiffs must have been issued immigrant visas. Any failure by the consular officers to follow the FAM's binary directives cannot transform a visa refusal into a visa approval, nor can an approval notice with no legal import compel the issuance of an immigrant visa.[10] Nor does it give rise to jurisdiction to review those refusals further. See Morales

---

[10] Nor can plaintiffs successfully argue that the Government is estopped from refusing their immigrant visas because plaintiffs were issued notices that erroneously informed them that their visas had been approved. Although the

v. Goldbeck, No. 12-CV-2350, 2013 WL 937825, at *4 (E.D.N.Y. Mar. 11, 2013) ("Under the consulate non-reviewability doctrine, courts do not have jurisdiction to review a consular official's decision, even if its foundation was erroneous, arbitrary, or *contrary to agency regulations*.") (emphasis in original) (internal quotation marks and citations omitted).

Because the Court finds that plaintiffs were neither approved for visas nor issued them by virtue of having received an approval notice, the reason the consular officers advanced for their refusals – Proclamation 9645 – was facially legitimate and bona fide. And because the Court's review is limited to whether defendants' reason for refusing plaintiffs' visas was facially legitimate and bona fide, plaintiffs' claims under the Mandamus Act must be dismissed.

### 2. **Counts 2, 5, and 9**

Counts Two and Five present two alternative means through which plaintiffs ask the Court to review the consular officers' decisions to refuse their immigrant visas. In Count Two, plaintiffs ask the Court to review the visa refusals under the APA, 5 U.S.C. § 555, and set aside defendants' refusal to print and provide plaintiff-beneficiaries' immigrant visas as arbitrary and capricious agency action. In Count Five, plaintiffs allege that defendants violated their Fifth Amendment right to substantive due process because they were not given a facially legitimate and bona fide reason for the basis of the refusal of their immigrant visas.

---

Supreme Court has not held that an estoppel claim could never succeed against the Government, the Supreme Court has recognized – because the Government is differently situated than a private litigant – that it has "reversed every finding of estoppel [against the Government] that [it has] reviewed," and that it would "know an estoppel when [it] see[s] one." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 423 (1990) (internal citations omitted). This case is not the proper vehicle for estopping the Government, especially considering obvious the separation of powers concerns in the areas of immigration and national security and the well-established deference that is afforded to consular officers with respect to the issuance of immigrant visas.

In Count Nine, plaintiffs seek a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that defendants' actions and decisions to refuse plaintiffs' immigrant visas violate the INA, the APA, federal regulations, and the First and Fifth Amendments.

Because the Court has found that defendants provided plaintiffs with a facially legitimate and bona fide reason for the refusal of their immigrant visas, the Court cannot look behind that reason for additional factual information or to conduct additional scrutiny, so these claims must also be dismissed.

### C. Failure to State a Claim

Defendants have moved to dismiss the remaining counts (Counts Three, Four, Six, Seven, Eight, Ten, Eleven, and Twelve) under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. These counts generally challenge the statutory propriety and constitutionality of the reliance on Proclamation 9645 as a reason to refuse an immigrant visa.

As a descendant of the common law demurrer, see Roundtree v. City of New York, 778 F. Supp. 614, 617 (E.D.N.Y. 1991) (quoting Wright & Miller, Federal Practice and Procedure: Civil 2d § 1355), Rule 12(b)(6) serves two related but distinct purposes. First, it ensures that, consistent with Rule 8(a), a complaint includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). A motion to dismiss for a lack of plausibility argues that the plaintiff has not pled enough facts to give rise to an inference that he is entitled to relief, but instead, that the plaintiff has simply concluded that the elements of a specific violation of law are met and that the identified violation of law therefore occurred. In other words, the plaintiff must provide the defendant with sufficient facts to suggest that the specific violation of law actually happened,

and how, such that the defendant has adequate notice of the claims against him. This requirement is known as a well-pled complaint.

Separate from plausibility, however, Rule 12(b)(6) also requires even a well-pled complaint to state a legally cognizable claim for relief. A complaint could include a wealth of specific and particular facts, which would otherwise meet the standard for plausibility, but in some instances, no amount or combination of those facts could ever give rise to a violation of law. So, in addition to pleading plausible facts which give rise to an inference that the defendants are liable for the conduct alleged in the complaint, that alleged conduct must actually constitute a violation of law.

Portions of plaintiffs' amended complaint provide a perfect example of this latter purpose of Rule 12(b)(6). The amended complaint includes a substantial amount of facts and documents – including photographs – which describe the horrific conditions that plaintiff-beneficiaries fled in Yemen when they relocated to Djibouti. It leaves no doubt that these individuals have suffered greatly because of their circumstances. But the fact of their suffering is not by itself a legally cognizable claim for relief.

Thus, the Court must look not only at the volume and detail of the facts alleged in the amended complaint; the Court must also consider whether those facts amount to a violation of law such that the Court may grant plaintiffs any relief.

### 1. <u>Count 3: Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A)</u>

Plaintiffs claim that defendants' implementation of Proclamation 9645 violates their rights under the INA to be free from discrimination based on their ethnicity and national origin. <u>See</u> 8 U.S.C. § 1152(a)(1)(A) ("[N]o person shall receive any preference or priority or be

discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.").

Plaintiffs allege that defendants have "promulgated and enforced a program that delays adjudication of immigrant visa applications for Yemen[i] nationals" and that defendants have also "promulgated and enforced Presidential Proclamation 9645 which discriminates against Plaintiffs based on national origin . . . [and] clearly targets and discriminates on individuals based on their country of origin in direct violation of the Nondiscrimination Clause of the INA." The reasons plaintiffs cite in support of these allegations are that the Proclamation "assumes, without reason and/or statistical support, that the entire population of countries targeted are a threat to the United States and restricts their entry" and "fails to provide an adequate waiver for individuals, [because] in practice the waiver has been issued only on rare occasions."

To the extent this claim challenges Proclamation 9645 directly, it is foreclosed by Trump v. Hawaii, 138 S. Ct. at 2413-14, in which the Supreme Court rejected an identical argument because "it ignores the basic distinction between admissibility determinations and visa issuance that runs throughout the INA." (The Proclamation concerns the former, and 8 U.S.C. § 1152(a)(1)(A) applies to the latter.)

To the extent this claim challenges the "wrongful failure to issue visas that were approved before the Proclamation," as plaintiffs argue it does in their opposition to defendants' motion to dismiss, it is foreclosed by the Court's finding that plaintiffs were provided a facially legitimate and bona fide reason for the refusal of their immigrant visas. Because plaintiffs have not advanced an adequate allegation of bad faith on behalf of the consular officers who refused their visas, the Court cannot look behind the reason given for those refusals. See Din, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment); see also Mandel, 408 U.S. at 770.

In other words, plaintiffs' amended complaint does not state a legally cognizable claim for relief, because the conduct they have challenged does not constitute a violation of law.  This claim must therefore be dismissed.

### 2.  Count 4: Fifth Amendment Equal Protection

Plaintiffs seek an unspecified amount of monetary damages under Bivens v. Six Unknown Named Agents, 403 U.S. 388, claiming that their Fifth Amendment right to be free from discrimination on the basis of race, religion, and national origin was violated when their immigrant visas were refused pursuant to Presidential Proclamation 9645.

Specifically, plaintiffs allege that two individual defendants, President Donald Trump and his Senior Policy Advisor Stephen Miller, are liable to them for damages because they refused plaintiffs' immigrant visas on account of their national origin and Islamic faith.  Consistent with its obligation to construe the amended complaint in the light most favorable to plaintiffs, the Court reads plaintiffs' amended complaint to allege that the process by which President Trump and defendant Miller arrived at promulgating Proclamation 9645 compels the conclusion that plaintiffs' subsequent visa refusals based on the Proclamation were the byproduct of discrimination.[11]

Plaintiffs allege that defendant Miller has no experience in visa adjudications or immigration law and is "well documented as holding racist and xenophobic views, particularly against Muslim immigrants."  Nevertheless, he was the "chief architect" of Executive Order 13769, which was a predecessor of Proclamation 9645, and which was issued shortly after

---

[11] It is not clear whether the motivations of high-ranking Executive Branch officials are relevant in determining whether plaintiff has stated a claim for relief.  The Supreme Court recently granted the petition for certiorari in Department of Commerce v. U.S. District Court for the Southern District of New York, No. 18-557.  Although the argument and briefing schedule in that case has been suspended pending further order of the Court on the respondents' motion to dismiss as improvidently granted, the merits of the petition bring into question the underlying rationale of plaintiffs' claims – that the officials' motivations can be relevant to an otherwise objective record.

President Trump was "vocal about banning Muslims from entering the United States" during his campaign. Citing news articles, plaintiffs allege that President Trump and defendant Miller did not seek cooperation or legal review from federal agencies in drafting Executive Order 13769, and after Executive Order 13769 was enjoined, defendant Miller spoke publicly against the power wielded by the judiciary.

Plaintiffs further allege that the effects of Proclamation 9645 – including the (unsupported) fact that 85% of those individuals who have been refused pursuant to it were from Muslim-majority countries as compared to the fact that 90% of the immigrant visas issued in 2016 were to individuals from Iran, Syria, and Yemen – show that President Trump's and defendant Miller's "true intention" in promulgating Proclamation 9645 was "to implement 'a total and complete shutdown of all Muslims entering the United States' as promised while campaigning for the Presidency," rather than concerns for national security, which the Government now asserts.

Essentially, plaintiffs have cloaked a direct challenge to the legality of Proclamation 9645 in the garb of a Bivens claim for damages against the individuals who signed, advocated for, or drafted it. Setting aside the fact that the Court is skeptical that a Bivens remedy could even be extended to this scenario, see Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017) ("Given the notable change in the Court's approach to recognizing implied causes of action, however, the Court has made clear that expanding the Bivens remedy is now a 'disfavored' judicial activity."); Doe v. Hagenbeck, 870 F.3d 36, 42 (2d Cir. 2017) (noting Supreme Court's reluctance to extend Bivens liability "to any new context or new category of defendants") (internal quotation marks and citations omitted), before there can be a viable Bivens claim, there must first be the possibility of an underlying violation of plaintiffs' federally-protected rights.

Here, plaintiffs assert that their visa refusals based on Proclamation 9645 violate their Fifth Amendment equal protection rights. The Fifth Amendment does not contain an equal protection clause, see Weinberger v. Wiesenfeld, 420 U.S. 636, 638, n.2 (1975), but there is an equal protection "guarantee implicit in the Fifth Amendment's Due Process Clause," Sessions v. Morales-Santana, 137 S. Ct. 1678, 1686 n.1 (2017). Thus, the Fifth Amendment "forbid[s] discrimination that is so unjustifiable as to be violative of due process." Id (quoting Weinberger, 420 U.S. at 638 n.2).

Defendants argue that this claim lacks merit following Trump v. Hawaii. Plaintiffs recognize that the Supreme Court found that the President had the authority to issue Proclamation 9645, and that the Government has advanced a sufficient national security justification for the Proclamation such that it survives rational basis review. Hawaii, 138 S. Ct. at 2408, 2421-2423. Plaintiffs argue, however, that because Trump v. Hawaii involved a First Amendment Establishment Clause challenge, not a Fifth Amendment Equal Protection claim, the Supreme Court's finding that Proclamation 9645 survives rational basis review is not informative here.

Neither party has provided any authority or reasoning to support why they are correct. But before the Court must determine whether a more exacting standard of review than that applied in either Kleindienst v. Mandel, 408 U.S. at 770, (facially legitimate and bona fide reason) or Trump v. Hawaii (rational basis) is required,[12] the Court must first determine whether plaintiffs have even stated a claim for discrimination under the Fifth Amendment.

---

[12] It is not clear that plaintiffs are entitled to a standard equal protection analysis in this realm. Justice Kennedy, in his concurring opinion in Trump v. Hawaii, 138 S. Ct. at 2424, acknowledged that "[w]hether judicial proceedings may properly continue in [that] case, in light of the substantial deference that is and must be accorded to the Executive in the conduct of foreign affairs, . . . is a matter to be addressed in the first instance on remand." Thus, it appears that no court has yet to determine definitively when, if ever, and to what extent a court can review policies concerning immigration and national security when faced with constitutional challenges to those policies.

The Supreme Court's approach to Fifth Amendment equal protection claims is "precisely the same as to equal protection claims under the Fourteenth Amendment." Morales-Santana, 137 S. Ct. at 1686 n.1 (quoting Weinberger, 420 U.S. at 638 n.2). Plaintiffs argue that defendants' refusal of their immigrant visas pursuant to Proclamation 9645 discriminated against them on the basis of their race, religion, and national origin.

"In order to plead a Fifth Amendment claim for discrimination, a plaintiff must allege facts showing one of three things: (1) that a law or policy is discriminatory on its face; (2) that a facially neutral law or policy has been applied in an intentionally discriminatory manner; or (3) that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec., 811 F. Supp. 2d 803, 819 (S.D.N.Y. 2011) (internal quotation marks and citations omitted). Because the Supreme Court found in Trump v. Hawaii that the Proclamation is facially neutral, plaintiffs can only proceed with their equal protection claim if they have adequately pled that the Proclamation is enforced in an intentionally discriminatory manner or its enforcement has an adverse effect on individuals of plaintiffs' race, religion, or national origin, and was motivated by discriminatory animus.

Under either avenue, plaintiffs must "plead sufficient factual matter to show that [defendants] adopted and implemented the [policy] at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." Iqbal, 556 U.S. at 677 (2009). Purposeful discrimination "involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." Id. at 676-77 (internal quotation marks, citations, and alterations omitted).

The relevant section of the amended complaint includes the following four allegations: (1) "Defendants violated Plaintiff-Petitioners' constitutionally protected rights to be free from discrimination on the basis of race, religion, and national origin by refusing Plaintiffs-Beneficiaries immigrant visa based on a Presidential Proclamation that targets them on account of their national origin and religion."; (2) "Defendants' unlawful and discriminatory, and unlawful refusal of Plaintiff-Beneficiaries' previously approved immigrant visas continues to cause family separations and cause undue emotional and financial hardship on Plaintiffs."; (3) "But for Defendants purposeful delays, Plaintiffs-Beneficiaries would have been issued their approved immigrant visas long before the Presidential Proclamation took effect."; and (4) "Defendants President Trump and Miller violated Plaintiffs-Petitioner's constitutionally protected right under the Fifth Amendment Equal Protection Clause by refusing Plaintiff-Beneficiaries' previously approved immigrant visas the account of Plaintiff-Beneficiaries national origin and Islamic faith."

None of these allegations are entitled to the presumption of truth, because they are all conclusory, "formulaic recitation of the elements of a constitutional discrimination claim." Id. at 681 (quoting Twombly, 550 U.S. at 555). Indeed, plaintiffs' allegations closely resemble those rejected by the Supreme Court in Ashcroft v. Iqbal. There, the Supreme Court found that the respondent's allegations that "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest'" were insufficient to state a claim for relief because they were legal conclusions not entitled to the presumption of truth. This same conclusion applies here.

At best, the amended complaint can be read to include statements that President Trump made during his presidential campaign – which are found elsewhere in the pleading – as non-conclusory factual allegations. But accepting the truth of those allegations, that is, that the statements were made, the amended complaint does not give rise to an inference of purposeful discrimination based on those statements alone. And even when those statements are construed in the light most favorable to plaintiffs,[13] they still do not suggest that Proclamation 9645 was passed "because of" rather than "in spite of" any discriminatory animus. Rather, plaintiffs' claim consists only of the legal conclusions they ask the Court to adopt, not facts that they allege give rise to the inference that a violation of law occurred. This is not enough to state a claim for relief.

Even if plaintiffs had adequately stated a claim alleging the violation of their Fifth Amendment equal protection rights, plaintiffs' Bivens claim cannot survive because "a plaintiff in a Bivens action is required to allege facts indicating that the defendants were personally involved in the claimed constitutional violation." Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009). The amended complaint fails to explain how President Trump or defendant Miller was personally involved in the individual refusals of each plaintiffs' immigrant visa, and it is well-established that government officials cannot be held liable in a Bivens action under a theory of respondeat superior. See Iqbal, 556 U.S. at 676. (This, of course, further supports the contention that plaintiffs through their Bivens claim just intended to challenge the validity of Proclamation 9645 itself.)

---

[13] Although the Court must adhere to its obligation to read the factual allegations in the amended complaint in the light most favorable to plaintiffs, the Court must also be conscious of the Supreme Court's admonition that "[a]ny rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution, and our inquiry into matters of entry and national security is highly constrained." Hawaii, 138 S. Ct. at 2419-20.

This claim must therefore be dismissed.

### 3. Count 6: Fifth Amendment Procedural Due Process

Plaintiffs allege that defendants violated their Fifth Amendment right to procedural due process by failing to provide them with notice or an opportunity to be heard before they were deprived of their immigrant visas. Specifically, plaintiffs allege that they have a "constitutionally protected liberty interest in making personal choices regarding family matters in a manner that is free from unjustifiable government interference in said choices," and that defendants' refusal of the immigrant visas constituted a *de facto* deprivation of this liberty.

As Justice Scalia explained in the plurality opinion announcing the judgment in Kerry v. Din, 135 S. Ct. at 2132, before the Court can determine whether plaintiffs were "afforded sufficient process" under the Constitution, the Court must first determine whether plaintiffs were deprived of a liberty interest at all. Although plaintiffs urge the Court to adopt the sentiment of the dissenting opinion in Kerry v. Din that the denial of an immigrant visa of an immediate family member implicates a petitioner's liberty interest in marriage and familial association, id. at 2142 (Breyer, J., dissenting), the Court is more persuaded by the plurality's opinion that those liberty interests, although implicated by a visa refusal, are not infringed upon in the constitutional sense when an alien relative is denied a visa to enter the United States, see id. at 2134 (plurality opinion). As Justice Scalia explained:

> Nothing in the cases [petitioner] cites establishes a free-floating and categorical liberty interest in marriage (or any other formulation [petitioner] offers) sufficient to trigger constitutional protection whenever a regulation in any way touches upon an aspect of the marital relationship. Even if our cases could be construed so broadly, the relevant question is not whether the asserted interest "is consistent with this Court's substantive-due-process line of cases," but whether it is supported by "this Nation's history and practice."

<u>Din</u>, 135 S. Ct. at 2135 (plurality opinion) (quoting <u>Washington v. Glucksberg</u>, 521 U.S. 702, 723-24 (1997).

Here, as in <u>Kerry v. Din</u>, there is a long practice of regulating familial immigration decisions, and that practice precludes plaintiffs' claims that the denials of their visas have deprived them of a fundamental liberty interest.  Indeed, there exists a well-defined, accessible, and regulated statutory procedure whereby relatives of United States citizens, lawful permanent residents, or asylees may apply for a visa.  Although plaintiffs' visas were refused under that system, those refusals were based on a facially legitimate and bona fide reason.  Because plaintiffs failed to make a sufficient affirmative showing of bad faith on the part of the consular officers, the Court cannot explore those decisions any further, either under Justice Scalia's or Justice Kennedy's opinions in <u>Kerry v. Din</u>.

Thus, plaintiffs' Fifth Amendment claim must be dismissed, because plaintiffs were afforded all the process that they were "due" under the Constitution.

### 4.  <u>Count 7: First Amendment Establishment Clause</u>

Plaintiffs claim that defendants' implementation of Proclamation 9645 – which, according to the amended complaint, "denies immigrants entry to the United States based on their Islamic faith" – violates the Establishment Clause of the First Amendment.  This claim is foreclosed by the Supreme Court's decision in <u>Trump v. Hawaii</u>.

By extension, plaintiffs also claim that defendants' "discriminatory policies and practices towards delaying processing of immigrant visa applications" was because of plaintiffs' Islamic faith, and therefore violate the Establishment Clause.  Plaintiffs have included in the amended complaint only bare-boned and conclusory allegations with respect to the purported reason for the "delays" they experienced in this process.  There is no question that there existed a window

of time between when plaintiffs received an approval notice and when they received a refusal based on Proclamation 9645 or otherwise.  But the amended complaint does not even attempt to provide any facts as to why that window of time occurred.

Instead, plaintiffs filled this gap in their factual allegations with speculation and conclusions – namely, that this window of time was a purposeful delay, and that the purported delay was due to defendants' invidious religious discrimination.

The Court rejects these conclusions.  Because plaintiffs have included no facts to suggest that the gap in time constituted a purposeful delay, and that the alleged delay was the result of religious discrimination, this claim must be dismissed.

### 5.  <u>Count 8: 42 U.S.C. § 1985(3)</u>

Plaintiffs allege that defendants conspired to deprive them of equal protection of the law and of equal privileges and immunities of the law by agreeing to implement Presidential Proclamation 9645, which resulted in the ultimate refusal of plaintiffs' immigrant visas.

Under 42 U.S.C. § 1985(3), "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

As an initial matter, plaintiffs have not cited, and the Court's research has not uncovered any binding authority that holds § 1985(3) applicable to federal officials acting under color of federal law.  Although the Supreme Court has expanded § 1985(3)'s reach from conspiracies involving state action to purely private conspiracies, <u>see</u> <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 101 (1971), except those private conspiracies motivated by economic or commercial animus, <u>see</u>

United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 838 (1983), the Supreme Court has never held that this statute also applies to federal officers.  Nor, in this Court's opinion, would it.

Section 1985 originated from the Civil Rights Act of 1871.  "The general intent of this legislation was very narrow – to protect blacks and black supporters in the post-Civil War South."  Keating v. Carey, 706 F.2d 377, 394 (2d Cir. 1983) (Meskill, J., concurring and dissenting).  Although several courts have suggested that the Supreme Court in Griffin v. Breckenridge, 403 U.S. at 102, disavowed this statutory history in interpreting its reach to expand to purely private conspiracies, the Supreme Court was careful in that case not to transform this statute into a "general federal tort law."

Moreover, as the Supreme Court subsequently explained in United Brotherhood of Carpenters and Joiners of America v. Scott, 463 U.S. 825, its holding in Griffin v. Breckenridge was not intended to broaden the application of § 1985(3) far beyond the original purpose of the Civil Rights Act.  The Supreme Court reinforced the point that, to be actionable, a § 1985(3) challenge must involve "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action."  Id. (quoting Griffin, 403 U.S. at 102). Then, it continued on to explain that where the private conspiracy in Griffin v. Breckenridge involved invidious racial discrimination, the private conspiracy in United Brotherhood of Carpenters and Joiners of America v. Scott did not, so § 1985(3) could not apply unless the plaintiff alleged that there was some type of state action involved.  See Scott, 463 U.S. at 830, 835.

In so holding, the Supreme Court acknowledged that it was a "close question whether § 1985(3) was intended to reach any class-based animus" other than racial discrimination.  Id. at

836.  Although some legislative history supported the expansion in <u>Griffin v. Breckenridge</u> to private conspiracies, it was unwilling to allow § 1985(3) to reach far beyond that which was intended by the proponents of the Civil Rights Act.  Together, <u>Griffin v. Breckenridge</u> and <u>United Brotherhood of Carpenters and Joiners of America v. Scott</u> suggest that because § 1985(3) does not have explicit "state action" language like its counterpart, 42 U.S.C. § 1983, it is not inconsistent with the statutory text and legislative history to apply § 1985(3) to private conspiracies.  But it would be inconsistent to apply § 1985(3) to private conspiracies that have nothing to do with the original purpose of the Civil Rights Act.

This should not be read, however, as a license to expand § 1985(3) further by applying it to conspiracies by federal officials acting under color of federal law.  It is palpably clear that the proponents of the Civil Rights Act did not envision that it would apply against the federal government, because through the Civil Rights Act the federal government was vindicating citizens' civil rights against discriminatory state (or arguably private) action.  Federal officers (and federal soldiers) were the protectors and enforcers of those rights granted under the post-Civil War Amendments; the very notion that federal officers could have been violators of those rights would have seemed more than strange to the Reconstruction Congress.  Thus, it would be equally as, if not more, inconsistent with the purpose of the legislation to apply it to federal officers acting under color of federal law than it would be to apply it to purely private conspiracies that have nothing to do with class-based discrimination.

As a separate, and potentially more obvious matter, if § 1985(3) applied to federal officers, then it would render <u>Bivens</u> actions superfluous.  Indeed, one of reasons the Second Circuit, following remand from the Supreme Court's decision in <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388, found – notably, after <u>Griffin v. Breckenridge</u> – that the federal agents

who committed the Fourth Amendment violations in that case were not entitled to the absolute immunity from suit that federal officers generally enjoy precisely because "[t]he Civil Rights Act does not [] apply to federal officers." Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 456 F.2d 1339, 1341, 1346 (2d Cir. 1972). Because those officers could not be sued under the Civil Rights Act (including, by definition, § 1985(3)), then there would be no means through which the newfound Bivens right of action could be enforced if the federal officers were immune from that suit. This finding reinforces the well-established dichotomy between claims under the Civil Rights Act – including §§ 1983 and 1985 – which are brought against state officers (and to a limited extent, private actors, with respect to § 1985(3)), and claims under Bivens, which are brought against federal officers.

District courts are split on this issue, although it appears that the weight of authority reads Griffin v. Breckenridge broadly and applies § 1985(3) to federal officers. Compare Boruski v. Stewart, 381 F. Supp. 529, 534 (S.D.N.Y. 1974) ("Sections 1985 and 1986 of Title 42, while providing for private suits for damages, do not allow relief against the actions of federal officers acting under color of federal law.") (internal quotation marks and citations omitted) with Wahad v. F.B.I., 813 F. Supp. 224, 232 (S.D.N.Y. 1993) ("The scope of § 1985(3) shall not be narrowed by allowing federal agents to escape liability under it.") and Peck v. United States, 470 F. Supp. 1003, 1012 (S.D.N.Y. 1979) ("Indeed all the courts that have considered the problem in light of Griffin have held that ss 1985(3) and 1986 apply to federal officers acting under color of federal law."). With all due respect to those decisions, this Court finds that § 1985(3) is inapplicable to federal officers acting under color of federal law, consistent with the clear purpose behind the Civil Rights Act.

In any event, even if § 1985(3) does apply to federal officers acting under color of federal law, defendants would be entitled to qualified immunity on this claim. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). An officer is entitled to qualified immunity "unless the official's conduct violated a clearly established constitutional right." Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

As the above analysis reveals, it is by no means clearly established that § 1985(3) applies to federal officers acting under color of federal law. See Abbasi, 137 S. Ct. at 1867; Fazaga v. Fed. Bureau of Investigation, 916 F.3d at 1209. Here, as in Ziglar v. Abbasi, 137 S. Ct. at 1867, "it must be concluded that reasonable officials in [defendants'] positions would not have known, and could not have predicted, that § 1985(3)" would apply to them. Thus, defendants would be entitled to qualified immunity on any claim by plaintiffs that they violated § 1985(3).

But even if defendants are not entitled to qualified immunity on this point, plaintiffs' conspiracy claim would still fail. "Because 'Section 1985(3) provides no substantive rights itself,' a deprivation of a constitutional right is a required object of a conspiracy under 1985(3)." Ochoa v. Bratton, No. 16-CV-2852, 2017 WL 5900552, at *9 (S.D.N.Y. Nov. 28, 2017) (quoting Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979)). Here, plaintiffs have not adequately pled that an underlying violation of their constitutional rights occurred; they merely assert it.

And assuming, once more for the sake of argument, that plaintiffs had adequately pled an underlying violation of their constitutional rights, "stating a claim for conspiracy under § 1985

also requires a plaintiff to do more than merely state vague and conclusionary allegations respecting the existence of a conspiracy." Id. (internal quotation marks and citations omitted).

The facts included in the amended complaint that plaintiffs allege in support of their conspiracy claim are that: (1) President Trump has been consistently vocal about banning Muslims from entering the United States, including several of the statements he made during his campaign for the presidency; (2) President Trump has retweeted anti-Muslim propaganda; (3) President Trump signed an Executive Order directing agencies to draft new rules and guidance for the immigration system; (4) defendant Miller drafted President Trump's Executive Order 13769 and implied that its purpose was to prevent the development of a Muslim community in the United States; (5) former defendant Jefferson Sessions[14] was a vocal supporter of President Trump's efforts to ban Muslims from immigrating into the United States; and (6) former defendant Sessions allegedly praised a 1924 law that was allegedly "intended to end acceptance of all races into the United States" during an interview with Stephen Bannon of Breitbart News.

Noticeably absent from these allegations is any semblance of concerted action between the individual defendants. Plaintiffs' naked allegations of conspiracy must therefore be dismissed, because it is black letter law that there can be no conspiracy without a meeting of the minds. See Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (quoting Romer v. Morgenthau, 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000)); Ochoa v. Bratton, 2017 WL 5900552, at *9 ("Unsubstantiated, conclusory, vague or general allegations of

---

[14] Pursuant to Rule 25(d), Attorney General William Barr was automatically substituted as a party to this action when he was appointed as the successor Attorney General. The Court can still consider these allegations involving former defendant and former Attorney General Sessions, however, because all of the alleged co-conspirators need not be named in the amended complaint for the conspiracy claim to succeed.

a conspiracy to deprive constitutional rights are not enough to survive a motion to dismiss.")
(quoting <u>Williams v. Reilly</u>, 743 F. Supp. 168, 173 (S.D.N.Y. 1990)).

### 6. <u>Count 10: Ninth Amendment</u>

Plaintiffs allege that defendants' policies, procedures, and methods for delaying the printing and issuing of plaintiffs' immigrant visas violate their fundamental right to integrity of the family, which is implied in the Ninth Amendment. <u>See</u> U.S. Const. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.").

As the Supreme Court has recognized, "[t]he integrity of the family unit has found protection in [among other constitutional provisions] . . . the Ninth Amendment." <u>Stanley v. Illinois</u>, 405 U.S. 645, 651 (1972) (citing <u>Griswold v. Connecticut</u>, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring)). In his concurring opinion in <u>Griswold v. Connecticut</u>, 381 U.S. at 496, Justice Goldberg wrote that the Ninth Amendment protects additional fundamental rights that "exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments."

But as the Second Circuit has explained, "[t]he Ninth Amendment is not an independent source of individual rights; rather, it provides a 'rule of construction' that we apply in certain cases." <u>Jenkins v. C.I.R.</u>, 483 F.3d 90, 92 (2d Cir. 2007) (citing <u>United States v. Bifield</u>, 702 F.2d 342, 349 (2d Cir. 1983)). "The rule dictates that the [] full scope of the specific guarantees in the Constitution is not limited by the text, but embraces their purpose." <u>Id.</u> at 92-93 (internal quotation marks, citations, and alterations omitted).

Plaintiffs' Ninth Amendment claims are nothing more than a "mere recasting" of their other constitutional challenges, which are "rooted in [the] historical interpretation of the

principles embodied by" separate constitutional provisions.  See id.  As a result, plaintiffs' Ninth Amendment claim is dismissed.

### 7.  <u>Count 11: Fifth Amendment Substantive Due Process Right to Parent</u>

Plaintiffs also claim that defendants' policies, procedures, and methods for delaying the printing and issuing of their immigrant visas systematically violate the "parental rights doctrine," which is protected by the Fifth Amendment due process clause.  Plaintiffs allege that they have a "constitutionally protected parental right to control the upbringing and education of their children in a manner that is free from unjustifiable government interference in said upbringing."

This substantive due process claim relies upon the Supreme Court's line of cases "which interprets the Fifth and Fourteenth Amendments' guarantee of due process of law to include a substantive component, which forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."  Reno v. Flores, 507 U.S. 292, 301-02 (1993) (internal quotation marks and citations omitted).  The analysis "must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field."  Id. (internal quotation marks, citations, and alterations omitted).  Once the right asserted is properly defined, "narrow tailoring is required only when fundamental rights are involved."  Id. at 305.  "The impairment of a lesser interest . . . demands no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose."  Id.

The Court agrees with plaintiffs that "the custodial parent has a constitutional right to determine, without undue interference by the state, how best to raise, nurture, and educate the child."  Troxel v. Granville, 530 U.S. 57, 95 (2000).  There is also a fundamental right to "retain

custody" of one's child.  See Stanley, 405 U.S. at 653.  Those rights, however, are not at issue in this case.

Under a fair reading of the amended complaint, plaintiffs have not in fact asserted that either of these fundamental rights were infringed.  Much like Justice Scalia's explanation of the petitioner's claim in Kerry v. Din, plaintiffs have "supplemented" these fundamental rights "with a fundamental right to live in the United States."  See Din, 135 S. Ct. at 2134 (plurality opinion).  Although Kerry v. Din concerned procedural, and not substantive, due process, the overarching rationale of the plurality opinion is still persuasive here, because of the similar approach plaintiffs take to defining their asserted constitutional rights.

The essence of plaintiffs' claim is that the denial of certain of their relatives' immigrant visas has interfered with their ability to raise their children in the United States (either because a plaintiff-petitioner's child beneficiary was refused a visa, or because a plaintiff-beneficiary parent was granted a visa, but their derivative was refused, or vice versa).  Of course, those visa refusals necessarily prevent the parents from exercising custody of their children in the United States or choosing how they raise their children in the United States.

But these plaintiffs do not have a fundamental right to have or raise their children in the United States.  See Mandel, 408 U.S. at 761; see also Din, 135 S. Ct. at 2134; Gebhardt v. Nielsen, 879 F.3d 980, 988 (9th Cir.) ("[T]he generic right to live with family is 'far removed' from the specific right to reside in the United States with non-citizen family members.").  If the "unadmitted and nonresident alien" children do not have a constitutional right of entry, Mandel, 408 U.S. at 761, then their parents cannot use their familial relationship with those children to bypass that constitutional restriction by asserting that they have a fundamental right to parent their child in the country of their choosing or the country in which they reside.

The same is true if a child was granted a visa but the parent was refused. The parent, who does not otherwise have any right to be present in the country, cannot leapfrog over that barrier simply because their child lives in the United States. Cf. Noel v. Chapman, 508 F.2d 1023, 1027 (2d Cir. 1975) (noting that resident aliens cannot keep their unadmitted nonresident alien husbands in the country "on the theory that the integrity of the family is protected by equal protection principles"). Indeed, if that were the case, it would render superfluous the carefully detailed statutory provisions of the INA that govern the issuance of visas for parents and children, because under plaintiffs' theory, once one family member is admitted, the rest can follow in tow. See Gebhardt, 879 F.3d at 988 (noting that individuals' "strong interest in living with their [non-citizen] family members . . . cannot be so fundamental that it overrides Congress' plenary power in this domain").

Rather, parents have a fundamental right, once both they and their children have lawfully entered the country, to retain custody of their children, if the state or someone else is attempting to prevent that custody, or to otherwise raise their child without undue governmental interference. The right to be in the United States cannot be tacked onto other fundamental rights, lest they be expanded far beyond their intended constitutional reach.

As a result, plaintiffs have alleged the impairment of a lesser interest, so the less demanding standard of review articulated above applies to their claims. Because there exists a reasonable fit between the national security purposes of Proclamation 9645 and the INA and the decision to deny plaintiffs' visas, plaintiffs' claim must be dismissed.

Moreover, as plaintiffs recognize in the amended complaint, any rights they have to raise their children are subject to justifiable government interference. Even assuming the compelling interest test applied, plaintiffs' claim would still fail. Because the Court found that the decision

to refuse plaintiffs' visas were based on a facially legitimate and bona fide reason, any interference with plaintiffs' rights to raise their children was justified. Plaintiffs' refusal based on the Proclamation, which has been deemed enforceable by the Supreme Court, was therefore constitutional. See Din, 135 S. Ct. at 2133 (plurality opinion) (noting that "it is obvious that a law barring aliens engaged in terrorist activities from entering this country is narrowly tailored to serve a compelling state interest").

### 8. Count 12: First and Fifth Amendment Right to Familial Association

Finally, plaintiffs allege that defendants' policies, procedures, and methods for delaying the printing and issuing of plaintiffs' immigrant visas systematically violate their First and Fifth Amendment rights to familial association. Plaintiffs allege that these rights guarantee them the ability to associate with their family members, including their companionship, without unjustifiable government interference or deprivation.

The constitutional concept of freedom of association stems from two lines of Supreme Court decisions. "In one line of decisions, the [Supreme] Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984). "In another set of decisions, the [Supreme] Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." Id.

As for plaintiffs' First Amendment claim, the Second Circuit has explained that "First Amendment associational rights protect against state intrusion into a family relationship intended

to retaliate for a family member's exercise of his or her First Amendment rights." Gorman v. Rensselaer Cty., 910 F.3d 40, 47 (2d Cir. 2018). For the same reason the Court found that plaintiffs failed to plead that defendants' conduct gives rise to an inference that their First Amendment rights were violated, see supra Section II.C.4, plaintiffs cannot show that defendants intended to retaliate against them because of their relatives' religion. There simply are no facts included in the amended complaint that suggest such conduct occurred.

With respect to plaintiffs' Fifth Amendment claims, the Court construes this right as analogous to the recognized Fourteenth Amendment right to privacy. See Stevens v. Holder, 966 F. Supp. 2d 622, 633 n.7 (E.D. Va. 2013). "In this respect, freedom of association receives protection as a fundamental element of personal liberty." Jaycees, 468 U.S. at 618.

Although familial association is an element of personal liberty, as explained above, see supra Section II.C.7, plaintiffs are not free to qualify that right by adding to it "in the United States." In other words, there is not a fundamental liberty right to familial association in this country. This right exists once family members are lawfully present in the United States. Only then do they have a right against unjustifiable governmental interference in their family affairs.

Even assuming plaintiffs did have some sort of right to associate with their family members in the United States, plaintiffs' claim would still fail. The Second Circuit has held that "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." Gorman, 910 F.3d at 48. Plaintiffs have not alleged, other than by baldly asserting that defendants harbor discriminatory animus against them because of their national origin and religion, that the Government intended by these visa refusals to interfere with any of the specific familial units identified in the amended complaint.

Nor do plaintiffs allege that defendants engaged in "conduct so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection," which plaintiffs are required to plead in a claim for interference with their right to familial association under the due process clause.  See id. (internal quotation marks and citations omitted).  Rather, as the Court has found, defendants denied plaintiffs' immigrant visas based on a facially legitimate and bona fide reason.  Unless the Court were to accept plaintiffs' conclusions and speculations about defendants' nefarious ulterior motives, which the Court is foreclosed from doing based on Supreme Court precedent and basic pleading standards, it can hardly be said that the amended complaint encompasses allegations of that nature.

This claim must therefore be dismissed.

## CONCLUSION

Accordingly, plaintiffs' [69] motion for class certification is DENIED and defendants' [72] motion to dismiss is GRANTED.   The Clerk of Court is directed to enter judgment dismissing the amended complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
        March 26, 2019